**The CITY OF NEW YORK, Plaintiff,**

v.

**A–1 JEWELRY & PAWN, INC.; Adventure Outdoors, Inc.; Cole's Gun Shop, Inc., Dunkelberger's Sports Outfitters; Gallery Distributing, Inc.; Greg L. Driggers d/b/a AAA Gun & Pawn Brokers; The Gun Store, Inc.; Harold W. Babcock, Jr. d/b/a Webb's Sporting Goods; James Thomas Farmer d/b/a Jim's Guns and Whatever; Mickalis Pawn Shop, LLC; Nancy Dailey d/b/a Peddler's Post; Old Dominion Guns & Tackle, Inc.; Patriot Services, Inc.; Welsh Pawn Shop, Inc. d/b/a Big Tom's Pawn Shop; Woodrow C. Holman III d/b/a Woody's Pawn Shop, Defendants.**

No. 06–CV–2233.

United States District Court, E.D. New York.

Dec. 18, 2007.

venture Outdoors, Inc.; Harold W. Babcock Jr.; Mickalis Pawn Shop, LLC; Nancy Dailey; and Woodrow C. Holman III.

Pisciotti, Malsch & Buckley, by Anthony Michael Pisciotti, Jeffrey Martin Malsch, for Defendants Gallery Distributing, Inc. and the Gun Store, Inc.

Michael Cardozo, by Eric Proshansky, Ari Biernoff, Gail P. Rubin, Melanie C.T. Ash, Richard J. Costa, Pillsbury Winthrop Shaw Pittman LLP, by Bryan Robert Dunlap, James Gardner Wheaton, Kenneth William Taber, Nicholas John Minella, for Plaintiff City of New York.

Law Office of John M. Lambros, by John Michael Lambros, for Defendant Old Dominion Guns & Tackle, Inc.

Renzulli Law Firm LLP, by John F. Renzulli, Scott Charles Allan, for Defendants Ad-

MEMORANDUM & ORDER

JACK B. WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I. Introduction.................................................304

II. Motion to Amend the Complaint Against the Gun Store and Gallery
 Distributing.................................................305
 A. Law.................................................306
 B. Application of Law to Facts.................................................306
 C. Conclusion as to Amendment of the Complaint.................................................307

III. Motion to Dismiss for Lack of Subject Matter Jurisdiction by the Gun Store
 and Gallery Distributing.................................................307
 A. Law.................................................307
 B. Application of Law to Facts.................................................307
 C. Conclusion as to Subject Matter Jurisdiction.................................................308

IV. Renewed Motion to Dismiss for Lack of Personal Jurisdiction by the
 Adventure Outdoors Group.................................................308
 A. Defendants' Arguments.................................................308
 B. Law.................................................309
 C. Application of Law to Facts.................................................310
 D. Conclusion as to the Adventure Outdoors Group's Renewed Motion to
 Dismiss.................................................310

V. Motions to Dismiss for Lack of Personal Jurisdiction by the Gun Store,
 Gallery Distributing and Old Dominion.................................................310
 A. Facts.................................................311
 1. Sources of Information Available to the City.................................................311
 2. Retailer Factors.................................................312
 a. Number of Trace Handguns Linked to Criminal Investigations
 in New York and Elsewhere that are Attributable to a
 Defendant.................................................312
 i. Temporal Limitations.................................................312
 ii. Inherent Limitations.................................................312
 b. Distribution Practices and Their Possible Effects on Crimes in
 New York.................................................312
 i. The City's Simulated Straw Purchases.................................................312
 ii. Trafficking Prosecutions.................................................313
 iii. Multiple Sales.................................................313
 c. Time–to–Crime of Retailer's Guns Recovered in New York.................................................313
 d. Sales Price and Type of Gun.................................................314
 e. Crimes Committed in New York with a Retailer's Guns.................................................314

f. Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets ...........................................314
g. Actions of Regulatory Authorities Related to the Retailer's Distribution Practices ......................................314
h. Defense Reliance on Formal Compliance with Federal and State Retail Sales Requirements ............................315
3. Overview of Each Moving Defendant ...............................316
4. The Gun Store—Doraville, Georgia ..................................316
a. Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant ...............................................318
b. Distribution Methods and Their Possible Effects on Crimes in New York—Straw Purchases ..................................318
i. United States v. Challenger, No. 98–CR–403 (N.D.Ga. 1998) .............................................318
ii. United States v. Caines, No. 99–CR–708 (N.D.Ga.1999) ........318
iii. United States v. Johnson, No. 00–CR–572 (S.D.N.Y.2000) .....318
iv. United States v. Corley, No. 00–CR–077 (N.D.Ga.2000) ........318
v. United States v. Allen, No. 00–CR–873 (N.D.Ga.2000) .........318
vi. United States v. Crooke, No. 01–CR–231 (N.D.Ga.2001) .......319
vii. United States v. Smith, No. 01–CR–231 (N.D.Ga.2001) ........319
viii. United States v. Stephens, No. 02–CR–351 (S.D.N.Y.2002).....319
ix. United States v. Gladney, No. 03–CR–084 (N.D.Ga.2003).....319
x. United States v. Atkinson, No. 03–CR–223 (N.D.Ga.2003).....319
xi. United States v. Vinson, No. 04–CR–112 (N.D.Ga.2004)........319
xii. United States v. Garcia–Diaz, No. 05–CR–271 (N.D.Ga. 2005) .............................................319
xiii. United States v. Garcia–Diaz, No. 05–CR–271 (N.D.Ga. 2005) .............................................319
xiv. United States v. Franklin, No. 06–CR–221 (N.D.Ga.2006).....320
xv. United States v. Phillips, No. 06–CR–287 (N.D.Ga.2006) .......320
xvi. United States v. Gobert, No. 06–CR–288 (N.D.Ga.2006) .......320
c. Distribution Methods and Their Possible Effects on Crimes in New York—Multiple Sales ..................................320
d. Time–to–Crime of Retailer's Guns Recovered in New York .........320
e. Sales Price and Types of Guns ..................................320
f. Crimes Committed in New York with Retailer's Handguns..........320
g. Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets ........................................321
h. Actions of Regulatory Authorities Related to The Gun Store's Distribution Practices .......................................321
5. Gallery Distributing—Mount Penn, Pennsylvania......................321
a. Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant ...............................................323
b. Distribution Methods and Their Possible Effects on Crimes in New York—Straw Purchases ..................................323
i. United States v. Morales, No. 00–CR–738 (E.D.Pa.2000).....323
ii. United States v. Ellison, No. 03–CR–597 (E.D.Pa.2003)........323
iii. United States v. Basnight, No. 05–CR–727 (E.D.Pa.2005).....323
iv. United States v. Haynes, No. 06–CR–146 (E.D.Pa.2006) .......323
c. Distribution Methods and Their Possible Effects on Crimes in New York—Multiple Sales ..................................323
d. Time–to–Crime of Retailer's Guns Recovered in New York .........323
e. Sales Price and Types of Guns ..................................323
f. Crimes Committed in New York with Retailer's Handguns..........324
g. Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets ........................................324

 h. Actions of Regulatory Authorities Related to the Gallery
 Distributing's Practices ..................................... 324
 6. Old Dominion—Danville, Virginia ............................. 324
 a. Number of Trace Handguns Linked to Criminal Investigations
 in New York and Elsewhere that are Attributable to the
 Defendant ...................................................... 326
 b. Distribution Methods and Their Possible Effects on Crimes in
 New York—Straw Purchases ............................... 326
 c. Distribution Methods and Their Possible Effects on Crimes in
 New York—Multiple Sales ................................. 326
 d. Time–to–Crime of Retailer's Guns Recovered in New York ........ 326
 e. Sales Price and Types of Guns ................................. 326
 f. Crimes Committed in New York with Retailer's Handguns......... 326
 g. Total Number of Handguns the Retailer Sold in the United
 States and its Total Revenue from the United States and
 New York Markets .......................................... 327
 h. Actions of Regulatory Authorities Related to Old Dominion's
 Distribution Practices ...................................... 327
 B. Law ...................................................................... 327
 1. Long Arm Jurisdiction Generally ................................. 327
 a. CPLR 302(a)(3)(ii) ........................................... 327
 i. Legislative History ....................................... 328
 ii. Cases .................................................... 329
 iii. Injury Causing Acts as Tortious in Foreign and Forum
 State .................................................... 330
 iv. Burden of Proof.......................................... 331
 v. Reasonable Expectation of Consequences in New York ....... 331
 vi. Derives Substantial Revenue from Interstate Commerce..... 332
 b. Due Process ................................................. 333
 i. Minimum Contacts ....................................... 333
 ii. Reasonableness .......................................... 335
 iii. State Interest............................................ 335
 c. Cumulative Parallel Conduct ................................... 336
 2. Long Arm Jurisdiction in Gun Cases............................. 338
 C. Application of Law to Facts ............................................ 338
 D. Conclusion as to Personal Jurisdiction ................................ 342

VI. Motions to Dismiss for Failure to State a Claim ............................ 342
 A. Defendants' Arguments .............................................. 342
 B. Rule 12(b)(6): Standard and Scope.................................... 342
 C. Common Law Public Nuisance ........................................ 343
 1. Law ............................................................. 343
 a. Conduct of the Defendants Creating, Contributing to, or
 Maintaining the Nuisance ................................. 343
 i. Intentional Conduct ..................................... 344
 ii. Negligent Conduct ...................................... 345
 iii. Otherwise Lawful Conduct .............................. 346
 b. Causation .................................................. 346
 i. Factual Cause .......................................... 346
 ii. Proximate Cause ........................................ 347
 iii. Causation in Suits Against the Firearms Industry ............ 348
 2. Application of Law to Facts ...................................... 348
 D. Statutory Nuisance .................................................. 349
 E. Protection of Lawful Commerce in Arms Act ("PLCAA") ................. 349
 1. Law ............................................................. 349
 2. Application of Law to Facts ...................................... 351
 F. Vagueness and Remedy .............................................. 353
 G. Extra–territoriality, Comity and Due Process .......................... 354
 H. Conclusion as to Motions to Dismiss for Failure to State a Claim ............ 355

VII. Motion to Stay Proceedings ............................................... 355

**304**

VIII. Motion for Certification for Interlocutory Appeal by Old Dominion . . . . . . . . . . . . . 355

IX. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 356

## I. INTRODUCTION

The City of New York filed complaints against fifteen out-of-state firearm retailers—(1) A–1 Jewelry & Pawn, Inc.; (2) Adventure Outdoors, Inc. ("Adventure Outdoors"); (3) Cole's Gun Shop, Inc.; (4) Dunkelberger's Sports Outfitters; (5) Gallery Distributing, Inc. ("Gallery Distributing"); (6) Greg L. Driggers; (7) The Gun Store, Inc. ("the Gun Store"); (8) Harold W. Babcock, Jr. ("Harold Babcock"); (9) James Thomas Farmer, (10) Mickalis Pawn Shop, LLC ("Mickalis Pawn Shop"); (11) Nancy Dailey; (12) Old Dominion Guns & Tackle, Inc. ("Old Dominion"); (13) Patriot Services, Inc.; (14) Welsh Pawn Shop, Inc.; and (15) Woodrow C. Holman III ("Woodrow Holman"). It had allegedly documented the regular arrival of illegally possessed guns in New York City which had been sold by these defendants in other states. The City alleges that guns sold by these defendants "are recovered from prohibited persons in New York City in numbers that far exceed recoveries for other comparably-situated gun dealers." *See* Amended Complaint ("Amended Comp.") ¶ 22, Docket Sheet for No. 06–CV–2233, Entry No. ("A–1 Docket Entry No.") 234. As part of its investigation, the City assessed the current willingness of each of the sued retailers to enter into "straw" purchases by apparent buyers standing in for the real buyers, a practice believed to speed guns through the illegal interstate market to New York City. *See id.* ¶¶ 58–63.

The complaint was filed on May 15, 2006. *See* Complaint, *A–1* Docket Entry No. 1. It alleged five causes of action as to each defendant: (1) public nuisance; (2) statutory nuisance; (3) negligence *per se;* (4) negligence; and (5) negligent entrustment. *See id.* ¶¶ 271–310. Relief sought was an injunction abating the public nuisance; an award for costs incurred in abatement; compensatory and punitive damages; reasonable counsel fees and costs; and "such other further relief as the Court may deem just and proper." *See id.* at pp. 77–78.

In a companion action, *The City of New York v. Bob Moates' Sport Shop, Inc.,* No. 06–CV–6504 (E.D.N.Y.2006) (the *Bob Moates'* action), the City sued twelve additional retail dealers on similar grounds—(1) Bob Moates' Sport Shop, Inc.; (2) Coastal Tile & Roofing Company, Inc.; (3) John Coscia; (4) Franklin Rod & Gun Shop, Inc.; (5) Gwinnett Pawn Shop, Inc.; (6) Hot Shots, Inc.; (7) Miller Rod & Gun, Inc.; (8) RJS Enterprises, Inc.; (9) Jerry Dale Rooks; (10) TCE of Virginia, Inc.; (11) Toccoa Pawn & Variety, Inc.; and (12) Trader World, Inc. Many of them have since settled. In the *Bob Moates'* action, the City alleged only two causes of actions: (1) public nuisance; and (2) statutory nuisance. *See Bob Moates,* Complaint ¶¶ 198–210, Docket Sheet for No. 06–CV–6504, Entry No. (*Moates'* Docket Entry No.) 1.

Seven of the original defendants in this *A–1* action have settled: (1) A–1 Jewelry & Pawn, Inc.; (2) Cole's Gun Shop, Inc.; (3) Dunkelberger's Sports Outfitters; (4) Greg L. Driggers; (5) James Thomas Farmer; (6) Welsh Pawn Shop, Inc; and (7) Patriot Services Inc. and its successor Virginia Firearms & Transfers, Inc.

The eight remaining defendants in the *A–1* action are: (1) Adventure Outdoors; (2) Gallery Distributing; (3) The Gun Store; (4) Harold Babcock.; (5) Mickalis Pawn Shop; (6) Nancy Dailey; (7) Old Dominion; and (8) Woodrow Holman. For purposes of this Memorandum and Order, because Adventure Outdoors, Nancy Dailey, Mickalis Pawn Shop, Harold Babcock and Woodrow Holman have thus far filed every motion in this case together, they will be referred to as the "Adventure Outdoors group."

The Adventure Outdoors group filed motions to dismiss for lack of personal jurisdiction. The motions were denied on August 15, 2007. *See City of New York v. A–1 Jewelry & Pawn, Inc.,* 501 F.Supp.2d 369 (E.D.N.Y.2007). The Adventure Outdoors group then filed a motion to reconsider; it was denied on September 27, 2007. *See* Order dated Sept. 27, 2007, *A–1* Docket Entry No. 280.

On August 29, 2007, the City filed and served an amended complaint on the Adventure Outdoors group; a responsive pleading has not yet been filed. *See* Fed.R.Civ.P. 15(a) ("A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ...."). The amended complaint is identical to the original complaint, except that the three negligence claims have been deleted. *Compare* Amended Compl. ¶¶ 274–86, *A–1* Docket Entry No. 234, *with* Compl. ¶¶ 271–310.

Of the defendants that had filed answers to the original complaint—Old Dominion, Gallery Distributing, and the Gun Store—only Old Dominion consented to the filing of the amended complaint. *See* Old Dominion's Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint at 7, *A–1* Docket Entry No. 267. Since Gallery Distributing and the Gun Store did not consent, the City filed a motion to amend the complaint. *See* The City's Motion to Amend the Complaint at 2, *A–1* Docket Entry No. 246.

The remaining defendants in this *A–1* action have now filed motions to dismiss. The Adventure Outdoors group has filed a motion to dismiss the amended complaint for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted. *See* Adventure Outdoors Group's Motion to Dismiss, *A–1* Docket Entry No. 259. The Gun Store and Gallery Distributing have filed a motion to dismiss the amended complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and for failure to state a claim upon which relief can be granted. *See* The Gun Store's and Gallery Distributing's Motion to Dismiss, *A–1* Docket Entry No. 265. Old Dominion has filed a motion to dismiss for lack of personal jurisdiction and for failure to state a claim upon which relief may be granted. *See* Old Dominion's Motion to Dismiss, *A–1* Docket Entry Nos. 267–68. Old Dominion also seeks certification of the personal jurisdiction issues to the Court of Appeals for the Second Circuit if this court denies its motion to dismiss. *See id.* All defendants seek a stay pending a decision by the Court of Appeals for the Second Circuit in *City of New York v. Beretta U.S.A. Corp.,* 401 F.Supp.2d 244 (E.D.N.Y.2005) ("*Beretta II*").

Pending are the motions by the defendants as outlined above and the City's motion to amend the complaint against Gallery Distributing and the Gun Store. The motions filed by Patriot Services, Inc. and its alleged successor Virginia Firearms & Transfers, Inc. are now moot since these defendants have settled. *See* Motions filed by Patriot Services, Inc. and Virginia Firearms & Transfers, Inc., *A–1* Docket Entry Nos. 261–64.

Some of the issues raised in the defendants' pending motions have been addressed by this court in the instant action and other similar actions. *See* subject matter jurisdiction in *City of New York v. Bob Moates' Sport Shop, Inc.,* No. 06–CV–6504, 2007 WL 906753, 2007 U.S. Dist. LEXIS 21085 (E.D.N.Y. Mar. 22, 2007); personal jurisdiction as related to firearm retailers and requests for certification of an interlocutory appeal in *City of New York v. A–1 Jewelry & Pawn, Inc.,* 501 F.Supp.2d 369 (E.D.N.Y. 2007), *reconsideration denied* by Order dated Sept. 27; failure to state a claim of public nuisance and statutory nuisance and objections to a remedy in *City of New York v. Beretta U.S.A. Corp.,* 315 F.Supp.2d 256 (E.D.N.Y.2004) ("*Beretta I*"); and failure to state a claim pursuant to the Protection of Lawful Commerce in Arms Act ("PLCAA"), concerns about extraterritoriality, comity and due process, and requests for a stay and interlocutory appeal in *Beretta II,* 401 F.Supp.2d 244.

For the reasons set forth below, the City's motion to amend the complaint against the Gun Store and Gallery Distributing is granted. Denied are defendants' motions to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and for failure to state a claim upon which relief can be granted. Old Dominion's motion to certify any unfavorable decision for interlocutory appeal is denied. Trial is set for April 28, 2007, at 10:00 a.m. Defendants' motion to stay proceedings is denied.

## II. MOTION TO AMEND THE COMPLAINT AGAINST THE GUN STORE AND GALLERY DISTRIBUTING

The Gun Store and Gallery Distributing oppose amending the complaint on two

grounds. First, they argue that the amended complaint will cause them undue prejudice because the three negligent causes of actions deleted from the original complaint are not being dismissed by the City with prejudice. *See* The Gun Store's and Gallery Distributing's Response to Motion to Amend at 5–9, *A–1* Docket Entry No. 250. These defendants state that they are willing to consent to the amended complaint if the City dismisses the three negligent causes of actions with prejudice. Second, they argue that the City's motion to amend should be denied because the amended complaint could not withstand a motion to dismiss for failure to state a claim. *Id.* at 9–20.

## A. Law

Under Rule 15(a) of the Federal Rule of Civil Procedure, "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or...." Fed.R.Civ.P. 15(a). If a responsive pleading has been filed, "[a] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *Id.* Courts look favorably on requests to amend. *See Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

■ Refusal to grant leave is reviewed for abuse of discretion. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("The grant or denial of an opportunity to amend is within the discretion of the District Court...."); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993); *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir.1990) (describing generally the right to amend). Leave to amend may be denied for a wide variety of reasons, including undue delay, bad faith, undue prejudice to the opposing party, or futility. *Foman*, 371 U.S. at 182, 83 S.Ct. 227; *Mackensworth v. S.S. Am. Merchant*, 28 F.3d 246, 251 (2d Cir.1994).

In order to determine "prejudice," the Court of Appeals for the Second Circuit has directed district courts to "consider whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993). *See also A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 87 F.Supp.2d 281, 299 (S.D.N.Y.2000) (holding that no prejudice results even when the amendment adds additional parties without adding to the defendant's discovery burdens). "One of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action." *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir.1998) (citations omitted). While mere delay itself does not warrant denial of leave to amend, delay accompanied by bad faith or undue prejudice provides sufficient basis for denial. *See Block*, 988 F.2d at 350 (citations omitted).

■ Amendment of a claim should be denied when the amendment will be futile in stating a viable claim. *See John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir.1994) (citing *Foman*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222). An amendment is futile when "it is beyond doubt that the plaintiff can prove no set of facts in support" of its amended claims. *Pangburn v. Culbertson*, 200 F.3d 65, 70–71 (2d Cir.1999) (internal quotation marks omitted). "The adequacy of the proposed amended complaint, however, is to be judged by the same standards as those governing the adequacy of a filed pleading." *Ricciuti*, 941 F.2d at 123. *See also* Fed.R.Civ.P. 8(a) ("A pleading which sets forth a claim for relief ... shall contain ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief ...").

## B. Application of Law to Facts

■ The City's amendments do not require the Gun Store and Gallery Distributing to expend significant additional resources in conducting discovery and preparing for trial. *See Block*, 988 F.2d at 350. Because the amendments eliminate claims, they do not require defendants to undertake additional discovery, or respond to new claims, theories,

or facts, nor will the proposed amendment delay resolution of the dispute.

Inapposite are the Gun Store's and Gallery Distributing's contentions that the amendments are "futile" because the amended complaint fails to state a cause of action upon which relief may be granted. As indicated below, the amended complaint does state a cause of action upon which relief may be granted.

## C. Conclusion as to Amendment of the Complaint

The City's motion to amend the complaint as to the Gun Store and Gallery Distributing is granted.

## III. MOTIONS TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION BY THE GUN STORE AND GALLERY DISTRIBUTING

The Gun Store and Gallery Distributing make a similar motion based upon lack of subject matter jurisdiction to the one denied by the court in the *Bob Moates'* action. *See City of New York v. Bob Moates'*, No. 06–CV–6504, 2007 U.S. Dist. LEXIS 21085, 2007 WL 906753 (E.D.N.Y. Mar. 23, 2007).

## A. Law

■ "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000). District courts have original jurisdiction "where the matter in controversy exceeds the sum or value of $75,000 ... and is between ... citizens of different States." 28 U.S.C. § 1332(a)(1). Once diversity of citizenship has been established, in order to justify dismissal it "must appear to a legal certainty that the claim is really for less than the jurisdictional amount...." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *accord Wolde–Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir.1999).

■ In actions seeking declaratory or injunctive relief, the amount in controversy is measured by the value of the object of the litigation. *Hunt v. Wash. State Apple Adver.*

*Com'n*, 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The Court of Appeals for the Second Circuit has observed that "the amount in controversy is calculated from the plaintiff's standpoint; the value of the suit's intended benefit or the value of the right being protected or the injury being averted constitutes the amount in controversy when damages are not requested." *Kheel v. Port of N.Y. Auth.*, 457 F.2d 46, 49 (2d Cir.1972) (internal quotations omitted). "Where the plaintiff seeks injunctive relief, the value of his claim is generally ... measured by the extent of the impairment to be prevented by the injunction. In calculating that impairment, the court may look not only at past losses but also at potential harm." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87–88 (2d Cir.1991).

## B. Application of Law to Facts

■ In its amended complaint the City alleges that there is "a near-daily stream of incidents in which City residents, City police officers and City visitors are shot dead or wounded by prohibited persons wielding illegally possessed handguns," Amended Compl. ¶ 4, and that between 1995 and 2005 "70,000 handguns [were] ... recovered by NYPD or other law enforcement agencies." *Id.* ¶ 48. The City contends that between 1995 and 2004 "approximately 5,400 people died in New York City as a result of gun violence ...", *id.* ¶ 49, and tens of thousands of gun related rapes, robberies and assaults occurred. *Id.* ¶ 50. Many of these guns were illegally obtained outside the city. *Id.* ¶¶ 54–55.

The City contents that over the course of eleven years, 126 handguns originally purchased at the Gun Store "were recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes." *Id.* at ¶ 11. As to Gallery Distributing, twenty-four handguns originally purchased from this defendant over a period of seven years have been recovered in New York City. *Id.* at ¶ 9. Handguns sold by both these defendants have been recovered in New York City as soon as four days after their original sale in Georgia. *Id.* at ¶¶ 9, 11.

The Gun Store and Gallery Distributing argue that the amended complaint seeks only prospective injunctive relief. They argue that the City cannot quantify the value of that relief because the amended complaint does not allege that there is a real and immediate threat of injury to the City. In its amended complaint, however, the City alleges that straw purchases contribute to a serious and costly nuisance and that an injunction will reduce the number of guns possessed and used illegally. *See* Amended Compl. ¶¶ 22–23, 270–273. The City has provided recent examples of straw purchases which involved Gallery Distributing and the Gun Store. *See id.* at ¶¶ 144–147 and ¶¶ 159–161 (Gallery Distributing); ¶¶ 159–165 (the Gun Store). The continuing nature of Gallery Distributing and the Gun Store's conduct sufficiently raises a real and immediate threat to the City justifying consideration of prospective relief.

Daily incidents involving illegal firearms impacting on the health and safety of the City and its residents are significant. Based on the number of gun related injuries and crimes alleged in the complaint, the value of the claim, measured by the injury to the City and its residents which would be averted if injunctive relief were granted, more than meets the jurisdictional amount. In addition, the City estimates that it expended $5,171,319 in medical costs for firearm fatalities and hospitalizations in 2001 alone. *See* The City's Omnibus Memo in Opposition to Motion to Dismiss, *A–1* Docket Entry No. 300, at 9. A substantial amount of this cost is, according to the City, traceable to guns sold by defendants and used illegally in New York City. The City's contention is that without an injunction such costs will continue.

For purposes of jurisdictional allegations the nuisance identified in the amended complaint imposes cost on the City attributable to each defendant in excess of $75,000. The Gun Store and Gallery Distributing have not established that the injury sought to be averted or the suit's intended benefit is insufficient to meet the requisite jurisdictional amount. Measured by the extent of the harm that may be prevented if injunctive relief is obtained against these defendants, as well as the medical and other costs that may be imposed on the City by the nuisance

alleged, the amount in controversy exceeds $75,000, exclusive of interest and costs.

### C. Conclusion as to Subject Matter Jurisdiction

The Gun Store's and Gallery Distributing's motion to dismiss the amended complaint for lack of subject matter jurisdiction is denied.

## IV. RENEWED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION BY THE ADVENTURE OUTDOORS GROUP

### A. Defendants' Arguments

The Adventure Outdoors group moves to dismiss the amended complaint for lack of personal jurisdiction. A similar motion to dismiss the original complaint by these defendants was denied by the court on August 15, 2007. *See City of New York v. A–1 Jewelry & Pawn, Inc.*, 501 F.Supp.2d 369 (E.D.N.Y.2007), *reconsideration denied by* Order dated Sept. 27, 2007. These defendants now renew their motion to dismiss for lack of personal jurisdiction to preserve the issue. *See* Fed.R.Civ.P. 12(g) and 12(h)(1); The Adventure Outdoors Group's Motion to Dismiss the Amended Complaint at 2, *A–1* Docket Entry No. 259. It argues:

> One of the requirements for the exercise of personal jurisdiction pursuant to N.Y. C.P.L.R. § 302(a)(3), is that the defendants must have committed a tortious act outside of New York. Assuming the requirements of N.Y. C.P.L.R. § 302(a)(3) have been satisfied, however, personal jurisdiction over the defendant is only available for a cause of action based on the defendant's tortious act outside of New York. N.Y. C.P.L.R. § 302. By eliminating its causes of action for negligence, negligence per se and negligent entrustment, the City can no longer rely on these causes of action to form the basis for the tortious act upon which to base personal jurisdiction.
>
> . . . .
>
> Inasmuch as personal jurisdiction pursuant to the New York long-arm statute is limited to "a cause of action arising from any of the acts enumerated in this section"— C.P.L.R. § 302 (emphasis added)—there is

no basis for personal jurisdiction over defendants for the City's first cause of action. Similarly, N.Y. Penal Law § 240.45 is not based on defendants' allegedly tortious acts outside of New York, but rather refers to "conduct either unlawful in itself or unreasonable under all the circumstances." More importantly, however, N.Y. Penal Law § 240.45 only applies to a defendant's conduct within the State of New York ... and therefore cannot serve as the basis for a tortious act by defendant outside of New York for purposes of N.Y. C.P.L.R. § 302(a)(3).

*Id.* at 2–3.

**B. Law**

■ A defendant may move for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. The burden of proving jurisdiction is on the party asserting it. *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir.1996). Personal jurisdiction in diversity cases is determined in accordance with the law of the forum state, subject to federal due process constraints. *See Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir.1990); *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986); *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir.1963). Jurisdiction in this case is asserted pursuant to the New York long arm statute, section 302(a) of the New York Civil Practice Law and Rules ("CPLR"), which provides in relevant part:

> Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent:
>
> . . . .
>
> 3. commits a tortious act without the state causing injury to person or property within the state, ... if he
>
> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or ...

N.Y.C.P.L.R. 302.

Section 302(a) does not require a plaintiff to plead a particular tort cause of action under New York law in order to sustain personal jurisdiction over a defendant. The Court of Appeals for the Second Circuit has emphasized that the cause of action alleged need not be a tort, so long as the "acts" giving rise to personal jurisdiction are themselves "tortious":

> We recognize the possibility that the claim brought in New York need not be a tort under New York law to justify invocation of § 302(a)(3) to confer jurisdiction. *Id.* Nonetheless, there must be some basis for considering the defendant's actions to be tortious, either under the law of New York or some other pertinent jurisdiction. In this case, plaintiff has shown no basis for considering defendant's actions to be tortious.

*Ehrenfeld v. Mahfouz*, 489 F.3d 542, 550 (2d Cir.2007).

Defendants' alleged violation of federal gun law is a "tortious act." As noted in the August 15, 2007 Memorandum and Order denying defendants' motion to dismiss the original complaint for lack of personal jurisdiction:

> United States jurisdictions, including those where the defendants and plaintiff reside, adhere to the rule that the violation of an applicable statutory provision constitutes negligence per se. *See, e.g., Decker v. Gibson Prods. Co.*, 679 F.2d 212, 213 (11th Cir.1982) (applying Georgia law); *Amick v. BM & KM, Inc.*, 275 F.Supp.2d 1378, 1381 (N.D.Ga.2003); *Scott v. Ford Motor Co.*, [229 F.3d 1143, at 2] (4th Cir. 2000) [ (table) ]; ... *O'Neil v. Windshire Copeland Associates, L.P.*, 197 F.Supp.2d 507, 510 (E.D.Va.2002); *Williams v. Hill Mfg. Co.*, 489 F.Supp. 20, 22 (D.S.C.1980); *Whitlaw v. Kroger Co.*, 306 S.C. 51, 410 S.E.2d 251, 252 (1991); *Austin v. Specialty Transp. Servs.*, 358 S.C. 298, 594 S.E.2d 867, 876 (2004); *Sikora v. Wenzel*, 88 Ohio St.3d 493, 727 N.E.2d 1277, 1280 (2000); *Chambers v. St. Mary's School*, 82 Ohio

St.3d 563, 697 N.E.2d 198, 201 (1998); *Elliott v. City of New York*, 95 N.Y.2d 730, 734, 724 N.Y.S.2d 397, 747 N.E.2d 760 (N.Y.2001); *Capital Management Co. v. Brown*, 813 A.2d 1094, 1099 (Del.2002); *Kauffman v. Schroeder*, 116 Ariz. 104, 568 P.2d 411, 414 (1977). Violations of federal and state gun control laws causing injury amount to negligence per se. *See e.g., Hetherton v. Sears, Roebuck & Co.*, 593 F.2d 526, 529–30 (3d Cir.1979); *West v. Mache of Cochran, Inc.*, 187 Ga.App. 365, 370 S.E.2d 169, 171 (1988); *Spires v. Goldberg*, 26 Ga.App. 530, 106 S.E. 585, (1921); *Coker v. Wal–Mart Stores, Inc.*, 642 So.2d 774, 776 (Fla.Dist.Ct.App.1994); *Rubin v. Johnson*, 550 N.E.2d 324, 329 (Ind.Ct.App.1990); *Lundy v. Hazen*, 90 Idaho 323, 411 P.2d 768, 770 (1966). The complaint's allegations regarding defendants' unlawful and unreasonable sales practices are sufficient to satisfy the tortious act requirement of CPLR 302(a)(3) under New York Law, in the first instance, or alternatively, under the laws of defendants' home states.

*City of New York v. A–1 Jewelry & Pawn, Inc.*, 501 F.Supp.2d 369, 415–16 (E.D.N.Y. 2007).

 A public nuisance claim can rest on negligent conduct. *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 41 N.Y.2d 564, 569–70, 394 N.Y.S.2d 169, 362 N.E.2d 968 (N.Y.1977) ("[N]egligence is . . . one type of conduct which may give rise to a nuisance."). Common law public nuisance claims can also be based upon allegations that a statute was violated. *See New York v. Fermenta ASC Corp.*, 238 A.D.2d 400, 403, 656 N.Y.S.2d 342 (1997) (describing common law public nuisance based on statutory violations); RESTATEMENT (SECOND) OF TORTS § 821 B, cmt. C. (Nuisance statutes can "amount to a legislative declaration that the conduct proscribed is an unreasonable interference with a public right").

**C. Application of Law to Facts**

 Defendants contend that the amended complaint only alleges "statutory causes of actions" and not common law public nuisance, and thus such "acts" do not fall within New York's long arm statute. The amended complaint alleges claims for common law

public nuisance, which include factual allegations that defendants' conduct also violates New York criminal law—e.g., sections 400.05(1) and 240.45 of the New York Penal Law. *See also* N.Y. Penal Law §§ 400.05(a), 240.45. The City's claims of common law public nuisance rest on detailed factual allegations of defendants' negligent and intentional tortious conduct. *See, e.g.*, Amended Compl. ¶¶ 92–97; 157–168; 226–239; 270–273; 275–280; 282–286. It is irrelevant for personal jurisdiction purposes that the City dropped its negligence, negligence per se and negligent entrustment claims. The gravamen of its action continues to sound in tort.

**D. Conclusion as to the Adventure Outdoors Group's Renewed Motion to Dismiss**

The Adventure Outdoors group's motion to dismiss for lack of personal jurisdiction is denied.

**V. MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION BY THE GUN STORE, GALLERY DISTRIBUTING, AND OLD DOMINION**

The Gun Store, Gallery Distributing, and Old Dominion did not file a motion to dismiss the original complaint for lack of personal jurisdiction. Pending before the court is their current motion to dismiss the amended complaint for lack of personal jurisdiction. These defendants argue that New York courts, state or federal, cannot assert personal jurisdiction over them. In rulings on similar motions defendants' contentions have been rejected. *See Johnson v. Bryco Arms*, 304 F.Supp.2d 383, 397 (E.D.N.Y.2004) ("*Johnson*"); *NAACP v. A.A. Arms, Inc.*, Nos. 99–CV–3999, 99–CV–7037, 2003 U.S. Dist. LEXIS 8238, 2003 WL 21242939 (E.D.N.Y. April 1, 2003) ("*NAACP*"); *NAACP v. Acusport Corp.*, Nos. 99–CV–7037, 99–CV–3999, 2000 U.S. Dist. LEXIS 17573, 2000 WL 1789094 (E.D.N.Y. Dec. 7, 2000) ("*Acusport*"); and *Hamilton v. Accu–Tek*, 32 F.Supp.2d 47 (E.D.N.Y.1998) ("*Hamilton*"). A similar motion to dismiss the complaint for lack of personal jurisdiction by the Adventure Outdoors group has already been denied. *See City of New York v. A–1 Jewelry*

*& Pawn, Inc.* 501 F.Supp.2d 369 (E.D.N.Y. 2007).

## A. Facts

### 1. Sources of Information Available to the City

The City has available to it five general sources of information concerning guns sold by the moving defendants:

1. Trace data from the National Firearms Trace Database, provided to the City by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), limited to guns recovered in New York City and New York State from 1994–2002 (the "New York Trace Data"). The numbers of traces in the City's amended complaint was based only on these eight years of New York City traces. The total number of guns attributed to certain moving defendants differs from those enumerated in the amended complaint because of the inclusion of New York State traces.

2. Trace data from the National Firearms Trace Database sold by ATF, through a private vendor, and available to the public until approximately 2001. This trace data includes guns recovered nationwide, but is limited to recoveries made from 1990 to 1997 (the "National FOIA Data"). ATF did not begin comprehensive tracing of all guns recovered until 1999. *See* Glenn L. Pierce, et al., *Characteristics and Dynamics of Illegal Firearms Markets: Implications for a Supply–Side Enforcement Strategy,* 21 JUST. Q. 391, 398 (2004). Trace data earlier than 1999, including the National FOIA Data, under-represents the actual number of crime guns sold by a particular retailer.

3. ATF trace requests made directly to a moving defendant that, if retained, should have been produced by defendants during the discovery in this action (the "Discovery Traces"). ATF may also request information of retailers by telephone to help determine the disposition of a particular firearm in the course of a criminal investigation. *See* 18 U.S.C. § 923(g)(7). It is unclear whether any of the present defendants record and maintain telephone requests. The number of "Discovery Traces" yields a conservative estimate of the actual number of trace requests made by ATF to a particular defendant.

4. Court documents and related information generated in connection with federal criminal prosecutions.

5. AMERICANS FOR GUN SAFETY FOUNDATION, SELLING CRIME: HIGH CRIME GUN STORES FUEL CRIMINALS (January 2004) (the "AGSF Report"). The AGSF Report uses ATF trace data compiled between 1996 and 2000 analyzed by National Economic Research Associates for the *NAACP* case. This report is limited to those retail firearms dealers with 200 or more guns traced to them for those years.

The City has made reasonable projections to fill in gaps created by ongoing trace data restrictions. *See City of New York v. Beretta U.S.A. Corp.,* 429 F.Supp.2d 517, 529 (E.D.N.Y.2006) (*"Beretta III"*). Defendants' failure to retain ATF trace requests may also be considered in assessing the evidence. A reasonable assumption in addressing the years of unavailable data is that, without any substantiated change in retail sales practices (which has not been asserted), the mean number of guns traced to a particular retailer in prior years from New York City provides a rough prediction of the yearly recoveries in the City for the unavailable years, i.e., 2003 to 2006. The use of average numbers of guns traced in prior years to project into missing years is a permissible predictor if there is no detectable trend upwards or downwards in the number of traces in prior years. Reasonable calculations show that there is no such trend—i.e., the number of traces was not systematically increasing or decreasing from year to year.

For the four years (2003 to 2006) for which New York Trace Data is unavailable, the number of expected traces for each moving defendant can be projected with sufficient accuracy, for a decision on this motion, by multiplying the mean number of traces per year by four years.

The information available provides more than enough data to support the City's factual claims on the present motions.

### 2. Retailer Factors

#### a. Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to a Defendant

The number of "crime guns" purchased from a gun retailer recovered in New York State is the foundation for of any determination that the retailer is properly subject to jurisdiction in New York. "Crime gun" is a term of art coined by the ATF for a gun that has been submitted for tracing. "The [ATF] traces firearms at the behest of law enforcement officials, and it seems safe to assume that law enforcement officials do not generally opt to have traces conducted out of idle curiosity." *J & G Sales, Ltd. v. Truscott* 473 F.3d 1043, 1052 (9th Cir.2007). Notwithstanding the impediments that have been placed in the way of the City's acquisition of relevant trace data, it has been able to compile sufficient information from available sources to derive a conservative estimate of the number of crime guns for which each moving defendant is responsible. The City's estimates are sufficiently reliable for deciding jurisdiction in view of (i) the temporal limitations on the data available to the City, and (ii) the inherent limitations on trace data as a quantitative measure of recovered guns. Both of these limitations are discussed below.

#### i. Temporal Limitations

The ATF trace data available to the City ends in 1997 for the National FOIA Data and in 2002 for the New York Trace Data. While the City also has in its possession national data containing traces through the end of 2005, it is presently foreclosed from using that information under the terms of the protective order entered in *Beretta* as a result of federal legislation. *See Beretta III*, 429 F.Supp.2d 517. The numbers of gun recoveries calculated by the City are derived from that data and, for the three moving defendants that did not destroy trace requests, from the Discovery Traces. For the defendants that destroyed their records of ATF trace requests: "[s]ince the necessary [jurisdictional] information is in the exclusive con-

trol of defendants, where they have failed to provide the information, plaintiffs have satisfied their burden...." *Hamilton*, 32 F.Supp.2d at 61.

#### ii. Inherent Limitations

The number of traces per moving defendant probably under-represents the actual number of their crime guns recovered in New York because it is likely that not all guns recovered from illegal purchasers were entered into the Trace Database during the years for which trace data is available. Many guns identified in federal prosecutions as having been acquired from a moving defendant by traffickers in straw purchases do not appear in the trace data. It may be assumed, of course, that many illegal guns trafficked into New York are never recovered and therefore not traced back to their source.

#### b. Distribution Practices and Their Possible Effects on Crimes in New York

#### i. The City's Simulated Straw Purchases

This action for public nuisance was commenced, the City contends, against each defendant only after it demonstrated a willingness to engage in what the plaintiff construes as an obvious straw purchase, a high-risk sales practice that is a well-recognized source of illegally trafficked guns. *See* Amended Compl. ¶¶ 58–63. An ATF investigation of gun-trafficking showed straw-purchasing to be involved in half of ATF's trafficking investigations, and in two-thirds of ATF's trafficking investigations in the Northeast. Straw purchasing accounted for the movement of 26,000 guns in the two-year period of the study. *See* ATF, FOLLOWING THE GUN: ENFORCING FEDERAL LAWS AGAINST FIREARMS TRAFFICKERS ix, 13, 18 (2000) (hereinafter, "FOLLOWING THE GUN"). The simulated straw purchase program conducted by City testers strongly suggests that federally-licensed firearms retailers ("FFLs") are able to recognize, and decline to participate in, straw purchases, as evidenced by the fact that approximately one-third of the retailers approached declined such sales, explaining that completing the sale would constitute (from their perspective) an illegal straw pur-

chase. *See, e.g.,* Amended Compl. ¶¶ 95, 237. By contrast, each moving defendant sold a gun in the course of a simulated straw purchase, permitting an inference that it will engage in straw purchases, negligently or deliberately, when presented with the opportunity to do so.

#### ii. Trafficking Prosecutions

The City has assembled direct evidence of illegal trafficking from some of the moving defendants' retail stores to the City, as evidenced by prosecutions of moving defendants' customers. For these moving defendants, participation in the City's straw purchase simulations confirms evidence, in the form of prior prosecutions, that they repeatedly facilitated straw purchasing. The evidence of gun trafficking from these moving defendants' stores is substantiated. Compilations of prosecutions such as those presented here present a conservative basis for estimating actual trafficking. Relevant prosecutions can be located in federal court files only on the basis of their lead charge. Thus, if the lead charge in a case is something other than gun trafficking, the case cannot readily be associated with guns. Additionally, ATF estimates that prosecutors are able to charge these violations in less than 45 percent of the straw purchasing cases. *See* FOLLOWING THE GUN at 43. In fact, "most federal laws controlling guns result in almost no prosecutions; this is particularly true of prosecutions for smuggling guns across state boundaries...." *NAACP v. Acusport,* 271 F.Supp.2d 435, 501 (E.D.N.Y.2003).

#### iii. Multiple Sales

Sales of multiple handguns at one time, to one purchaser, is an established indicator of gun trafficking. "Multiple sales in some states to the same person at the same or almost the same time result in many guns being diverted to criminal elements." *NAACP v. Acusport,* 271 F.Supp.2d at 502; *see* U.S. DEP'T OF JUSTICE, OFFICE OF INSPECTOR GENERAL, INSPECTION OF FIREARMS DEALERS BY THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES iii-iv (2004). There is a well-known relationship between straw purchasing and multiples sales: straw purchasers are likely to buy multiple guns.

*See* ATF, CRIME GUN TRACE REPORTS: NATIONAL REPORT ix, 52 (2000); ATF, COMMERCE IN FIREARMS IN THE UNITED STATES 21–22 (2000).

#### c. Time–to–Crime of Retailer's Guns Recovered in New York

"Time-to-crime is the time from the retail sale of a firearm to the time it is recovered at a crime scene or is traced. The average time-to-crime [for guns recovered nationwide] is six years." *Blaustein & Reich, Inc. v. Buckles,* 365 F.3d 281, 285 (4th Cir.2004), *cert. denied,* 543 U.S. 1052, 125 S.Ct. 887, 160 L.Ed.2d 774 (2005). According to ATF, a short time-to-crime suggests that a firearm was recently and illegally diverted from a retail outlet. *See* ATF, CRIME GUN TRACE REPORTS: NATIONAL REPORT at ix, 30 (2000). As to what constitutes a "short" time-to-crime:

> [T]hree years is considered a short time to crime, and is considered an important trafficking indicator, suggesting rapid movement to the illegal gun market. Thus, by identifying those dealers that have ten traces or more per year with a short time to crime of three years or less, ATF can obtain a sense of which dealers tend to sell guns that are ultimately used in crimes.

*Blaustein & Reich v. Buckles,* 220 F.Supp.2d 535, 540 (E.D.Va.2002) (citations omitted), *aff'd,* 365 F.3d 281 (4th Cir.2004), *cert. denied,* 543 U.S. 1052, 125 S.Ct. 887, 160 L.Ed.2d 774 (2005).

Short times-to-crime of a retailer's recovered guns are relevant from a jurisdictional perspective for two reasons. First, the shorter the time-to-crime in New York, the more likely that the retailer is in fact serving the New York market. Short times-to-crime are especially telling when the recovery time in the retailer's home state is comparable to, or even longer than, the recovery time in a foreign state—strengthening the inference that the retailer is engaged in out-of-state commerce with the foreign state. As shown below, for each moving defendant, the time-to-crime of their guns is faster in New York, or only slightly longer, than in their immediate home state. Second, "straw purchasing is a pattern of trafficking that is likely to result in crime guns with relatively short

time-to-crimes." Glenn L. Pierce et al., *Characteristics and Dynamics of Illegal Firearms Markets*, 21 JUST. Q. 391, 399 n. 2 (2004).

#### d. Sales Price and Type of Gun

Some brands of cheap handguns are more likely to give rise to public nuisance and public danger when they are in the hands of prohibited purchasers. Sales of such guns is a factor to be weighed for jurisdictional purposes. *See NAACP*, 2003 WL 21242939 at *1 & 8, 2003 U.S. Dist. LEXIS 8238 at *8 & *27 (noting, for jurisdictional purposes, defendant's advertising of "lower-end" guns costing less than $100).

The term "Saturday Night Special" is generally used to refer to the cheap, poorly-made handguns that are favored by some criminals. *See id.* at *10–11, 2003 U.S. Dist. LEXIS 8238 at *35–37. Saturday Night Specials are more likely to have shorter times-to-crime, more likely to have been purchased by a straw purchaser or other illegal purchaser, and more likely to have defaced serial numbers. For example, of the 780,000 guns recovered in crimes and contained in the National FOIA Data, well-known Saturday Night Special brands-such as Bryco, Lorcin, and Hi–Point–were found to be recovered in crimes far more quickly than more expensive brands, e.g., Colt, Beretta or Smith & Wesson:

| Manufacturer | Time-to-crime |
| --- | --- |
| Colt | 9.4 years |
| Beretta | 8.9 years |
| Smith & Wesson | 6.3 years |
| Lorcin | 2.9 years |
| Bryco | 2.8 years |
| Hi–Point | 2.0 years |

Of the 32,000 crime guns recovered by the New York Police Department ("NYPD") contained in the database of the NYPD Firearms Analysis Section, Saturday Night Special brands are more likely to be recovered with a defaced serial number than more expensive brands:

| Manufacturer | Percent defaced |
| --- | --- |
| Smith & Wesson | 6.4% |
| Colt | 8.3% |
| Beretta | 8.6% |
| Hi–Point | 16.9% |
| Bryco | 23% |
| Lorcin | 23% |

ATF has reported that a defaced or obliterated serial number suggests an intent to traffic the gun at the time it was purchased. *See* COMMERCE IN FIREARMS at 30; FOLLOWING THE GUN at 26 ("Serial number obliteration is a clear indicator of firearms trafficking").

#### e. Crimes Committed in New York with a Retailer's Guns

Crimes committed with guns sold by the moving defendants have been identified by matching the complaint number provided in either the National FOIA Data or the New York Trace Data with the matching complaint number in the NYPD's On-line Complaint System. Guns traced to the moving defendants by means other than trace data, i.e., through the Discovery Traces, are, after further analysis, matched to crimes as well.

#### f. Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets

New York City's strong gun control laws create a local scarcity, thus providing a profitable market for moving guns to the City. The ease with which guns may be purchased in the Southeast in particular means that "dealers have long been able to make a profit by buying guns in Virginia or points south and running them northward to the street markets of northeastern cities." *United States v. Cavera*, Nos. 05–CR –4591, 05–CR–5210, 2007 WL 1628799, at *9, 2007 U.S.App. LEXIS 13003, at *29 (June 6, 2007) (Calabrese, J., concurring) (quoting Philip J. Cook et al., *Guns and Violence Symposium: Regulating Gun Markets*, 86 J.CRIM. L. & CRIMINOLOGY 59, 72 (1995)), *opinion substituted by* 505 F.3d 216 (2d Cir.2007).

#### g. Actions of Regulatory Authorities Related to the Retailer's Distribution Practices

In 1999, ATF determined that 1.2% of FFL retailers—approximately 1,000 of the

then more than 80,000 retailers—accounted for more than half of all crime guns traced nationally. *See* COMMERCE IN FIREARMS IN THE UNITED STATES at 23–24. ATF determined that approximately 450 FFLs were each the source of ten or more crime guns with times-to-crime of three years or less. Based on this data, ATF began to demand additional sales information from the 450 FFL retailers identified by those criteria. *See Blaustein & Reich,* 365 F.3d at 285. The demands, now known as "ATF Demand Letters," imposed additional record-keeping requirements on these retailers. *See* 18 U.S.C. § 923(g)(5)(A). The threshold for a Demand Letter was raised to 15 traced guns in 2002. *See J & G Sales,* 473 F.3d at 1052.

A retailer's receipt of a Demand Letter— or the fact that a retailer has met the criteria for receipt of a Demand Letter—is a determination by an administrative agency with expertise in the subject area that the retailer's practices are associated with the recovery of a disproportionate number of crime guns. As the ATF Demand Letters themselves explain, "[ATF's] research ha[s] demonstrated that a high volume of gun traces with a short time-to-crime may indicate illegal firearms trafficking by an FFL dealer." *Blaustein & Reich,* 365 F.3d at 291.

A Demand Letter is significant for personal jurisdictional analysis because the Letter itself evidences suspect marketing and sales practices; it permits an inference that the retailer is tied to interstate second hand gun sales. For reasons intrinsic to the tracing process ATF trace data does not include second-hand guns sold by retail gun dealers. *See Blaustein & Reich,* 220 F.Supp.2d at 540. This is an additional reason for concluding that the number of guns attributable to each moving defendant is probably larger than shown in the various sources of trace data. "Focusing exclusively on new guns likely underestimates the true extent of gun trafficking." FOLLOWING THE GUN at 25. ATF requires retailers in receipt of a Demand Letter to also turn over their second-hand gun information because:

> The [ATF] reasonably deduced that since this small group of dealers was the original source of a disproportionate share of the new firearms that were traced, this same group might also be the source-through

illegal or legal means-of a substantial percentage of secondhand firearms that are traced.

*Blaustein & Reich,* 365 F.3d at 291; *accord J & G Sales,* 473 F.3d at 1053 ("We can think of no reason, and J & G has not offered one, to believe that an FFL retailer who sells a large number of new firearms that end up being traced would not similarly sell a large number of used firearms that also end up being traced."); *Blaustein & Reich,* 220 F.Supp.2d at 540–41 (dealers that sell significant numbers of new guns that quickly become crime guns are likely also to sell a significant number of used guns that eventually are used in crime).

Receipt of a Demand Letter or meeting the requirement for receipt of one is a relevant factor weighing in favor of the exercise of long-arm jurisdiction.

### h. Defense Reliance on Formal Compliance with Federal and State Retail Sales Requirements

Defendants contend that they comply with the whole array of federal and state laws applicable to sales by licensed retailers of firearms: each of them obtains and reviews government issued photographic identification from the prospective purchaser, which, in the case of a handgun sale must demonstrate that the prospective purchaser is a resident of the state. In addition, the prospective purchaser is required to complete a form 4473 and affirm, under penalties of perjury, that he: (1) is the actual buyer of the firearm; (2) is not presently under indictment or information in any court for a felony or any other crime for which the judge could imprison him for more than one year; (3) has not been convicted of a felony or any other crime for which the judge could imprison him for more than one year; (4) is not a fugitive from justice; (5) is not an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance; (6) has never been adjudicated mentally defective nor ever been committed to a mental institution; (7) has not been discharged from the Armed Forces under dishonorable conditions; (8) has not been the subject of a court order restraining him from harassing, stalking, or threatening

his child or an intimate partner or child of such partner; (9) has not been convicted in any court of a misdemeanor crime of domestic violence; (10) has never renounced his United States Citizenship; (11) is not an illegal alien in the United States; and (12) is not a non-immigrant alien, or if so, falls within any of the exceptions mentioned on the form. Once the retailer has reviewed the prospective purchaser's government issued photographic identification and responses on the form 4473, it contacts the Federal Bureau of Investigation ("FBI") to determine whether the prospective purchaser is legally entitled to purchase a firearm based on the results of an inquiry to the National Criminal Background Check System ("NICS").

Assuming that all these formal protective steps are taken before each sale, they are rendered completely nugatory if the transaction is a straw sale to a person who is standing in for another—the real purchaser. Fraud by the seller, the formal purchaser and the actual purchaser constitutes a tortious act in the state in which the sale takes place.

### 3. Overview of Each Moving Defendant

Moving defendants' principal jurisdictional argument is that they sell only to residents of their home state, and not in interstate commerce. Because Federal law only permits handgun sales to persons resident in the state in which the retailer is located, each claims compliance with that law, and denies receiving any revenue from goods used in New York or in interstate commerce.

Whatever movants may say that they do *de jure,* the central issue on this motion is whether they *de facto* serve an out-of-state market, including New York, through their illegal sales practices. The City has assembled substantial evidence that each of the moving defendants in fact serves an interstate market, through regular sales to straw purchasers, through multiple gun sales, or through internet sales. These practices permit moving defendants effectively to operate as if they were selling guns directly in New York.

The City's evidence confirms that moving defendants' wares regularly, and rapidly, arrive in New York via criminal channels. Some of the defendants have histories of selling guns to customers who engage in interstate gun-trafficking, as evidenced by the federal prosecutions of their customers. Some have histories of engaging in sales of guns that are relatively rapidly recovered out-of-state, confirming that these retailers also engage in sales practices that fuel the substantial interstate gun market. For both sets of movants, the evidence shows repeated illegal sales of firearms in a manner that has direct consequences in New York.

While the moving defendants argue that their allegedly modest sales volumes should weigh against any assertion of jurisdiction, discovery has established that they in fact sell guns in volumes comparable to distributors over whom jurisdiction was previously deemed appropriate in *NAACP. See NAACP,* 2003 WL 21242939 at *9–10, 2003 U.S. Dist. LEXIS 8238 at *31–32 (asserting jurisdiction, for example, over Brazas Sporting Arms with sales of 2,000 guns per year). Moreover, the number of traces to New York from the moving defendants is comparable to, or exceeds, the number of traces to New York deemed sufficient for jurisdiction over distributors in *NAACP. See id.* at *10–11, 11–12, 13–14, 14, 2003 U.S. Dist. LEXIS 8238 at *35, *38, *43, *45 (Excel Industries, 34 handguns traced to New York; Bill Hicks, 59 traced guns; Riley's Inc., 23 traced guns; William's Shooter's Supply, 35 traced guns).

### 4. The Gun Store—Doraville, Georgia

| Traces from criminal investigations to Δ handguns that Δ sold | Δ's distribution methods and their possible effects on crime in NY (e.g. straw sales) | Time to crime of Δ's guns recovered in NY | Sales price, types and intended uses of handguns that Δ sold | NY crimes committed with handguns that Δ sold | Δ's total unit and dollar sales of guns in US and NY markets | Actions of regulatory authorities related to Δ's practices |
|---|---|---|---|---|---|---|
| • 534 of Δ's guns were recovered in crimes nationwide, 1990–1997 (National FOIA Data).<br><br>• Of these 534 guns, where the place of recovery is known, more than 30% were recovered outside of Georgia (National FOIA Data).<br><br>• 646 of Δ's guns were recovered in crimes nationwide, 1996–2000 (AGSF Report). Pl.'s Ex. D.<br><br>• 138 guns were recovered in connection with crimes in New York (New York Trace Data). | • Multiple sales account for more than 20% of Δ's handgun sales since 2000). Pl.'s Ex. E.<br><br>• Repeated instances of the Gun Store selling multiple firearms to straw purchasers. Pl.'s Ex. F.<br><br>• Δ sold at least 340 additional guns to straw purchasers, 1998-2006. Pl.'s Ex. F. | • Average time for 82 guns = 3.02 years (New York Trace Data).<br><br>• 25 handguns (or 18%) recovered in crimes in New York State were recovered within one *month* of sale (New York Trace Data).<br><br>• 41% of guns recovered in crimes in New York State were recovered within one year of sale (New York Trace Data).<br><br>• 72% of guns recovered in New York were recovered within three years of sale (New York Trace Data). | • Approx. one-third of guns Δ sells are Sat. Night Specials (i.e., Lorcin, Bryco, Taurus, Hi-Point). Pl.'s Ex. E.<br><br>• 60% of the guns recovered in crimes in New York City are Saturday Night Specials (New York Trace Data). | • At least four homicides, multiple robberies, assault, burglary and kidnapping (New York Trace Data). | • Approximately 7,000 guns sold 2000-2006 in US, of which an estimated 12.9 % were recovered in crimes. Pl.'s Ex. E. | • Δ met criteria for ATF Demand Letter. |

### a. Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant

Based on the National FOIA Data, 534 guns sold by the Gun Store were recovered in crimes nationally during the period 1990 to 1997. The AGSF Report reveals that 646 handguns sold by the Gun Store were recovered in connection with crimes between 1996 and 2000. The Gun Store's role in serving an interstate market is evident—more than 30% of the guns sold by the Gun Store which appeared in the National FOIA Data were recovered outside of Georgia.

During the period from March 1994 through October 2001, the New York Trace Data reveals that at least 138 guns sold by the Gun Store were recovered in New York State.

### b. Distribution Methods and Their Possible Effects on Crimes in New York—Straw Purchases

As documented in federal prosecutions in Georgia and New York, the Gun Store sold at least 340 handguns to straw purchasers between 1998 and 2006. At least 154 of these guns were destined for the New York market, and many others were seized en route to New Jersey, Massachusetts, Washington D.C., Baltimore, and the Caribbean. Over 20 of the Gun Store's customers were found guilty of making false statements related to their straw purchasing of firearms during this time period. Prosecutions of straw purchasers to whom the Gun Store sold handguns include the following:

### i. United States v. Challenger, No. 98–CR–403 (N.D.Ga.1998)

In the summer of 1998, Chad McBrayer and Shameal Jackson were traveling in a rental car from Atlanta to New York when they were stopped for speeding. Police found ten firearms in their car, which had been purchased by James Bell a/k/a Marc Challenger. Subsequent investigation revealed that Marc Challenger had straw-purchased an additional 64 guns, all from the Gun Store, in a three-and-a-half-month period. On at least six occasions, Challenger had purchased seven or more guns at a time from the Gun Store.

### ii. United States v. Caines, No. 99–CR–708 (N.D.Ga.1999).

Two Georgia residents, Dashan Adika Caines and Ronald Junior King, met with an associate named Brenneis Nesbitt in Brooklyn, New York. The men agreed that Caines and King would purchase large quantities of firearms in Georgia for resale in New York. Nesbitt provided cash for all the purchases. The other men bought at least 42 handguns from the Gun Store in November and December 1999. The Gun Store sold up to 19 handguns in a single day to the men. Some of the handguns were recovered from Nesbitt and others in the Atlanta area; others may already have been trafficked to New York.

### iii. United States v. Johnson, No. 00–CR–572 (S.D.N.Y.2000).

A New York City resident, Damian Johnson, recruited several straw purchasers to obtain firearms for him in the latter part of 1999 and 2000. One of the straws, Gregory Beaton, would pick up Johnson from the Greyhound bus terminal, drive him to the Gun Store, purchase the firearms that Johnson ordered, and then drive Johnson (with the guns) back to the Greyhound bus terminal to return to New York City. Johnson told Beaton that he was taking to guns to New York City in order to resell them. Beaton bought approximately 40 guns for Johnson. Johnson had several other straw purchasers buying from the Gun Store at the same time.

### iv. United States v. Corley, No. 00–CR–077 (N.D.Ga.2000).

In August 1999, Youngblood Corley straw purchased six handguns from the Gun Store, including three identical Bryco 9mm's and two identical Lorcin 9mm's. Two days later, Corley shipped the handguns to New York; all but one were subsequently recovered in connection with crimes.

### v. United States v. Allen, No. 00–CR–873 (N.D.Ga.2000).

Beginning in February 2000, Rachman Naeem Allen recruited Kareem Yusef Rogers to buy firearms for him. Rogers straw purchased at least 34 handguns, 94% of them

Saturday Night Specials, all from the Gun Store. All of Rogers's buys involved multiple handguns, up to fourteen at a time. For instance, on July 25, 2000, Rogers bought ten identical Bryco 9mm's. Less than a month later, he returned to the Gun Store and purchased seven more of the same exact make and model of handgun.

*vi. United States v. Crooke,* No. 01–CR–231 (N.D.Ga.2001).

Canute Russell enlisted Anthony Ricardo Crooke and Evangelina Diane Smith to straw purchase handguns for him from several Atlanta-area dealers, including the Gun Store. Crooke and Smith ultimately bought Russell at least thirty-six weapons, mostly Lorcins and Hi–Points. The Gun Store made numerous multiple sales to the straws, including a May 7, 1999 sale of seven handguns (six of them Lorcins); a September 1, 1999 sale of twelve handguns (mostly Hi–Points and Lorcins); and, less than two weeks later, the sale of yet another thirteen handguns (all Hi–Points, Lorcins, and Phoenix Arms).

*vii. United States v. Smith,* No. 01–CR–231 (N.D.Ga.2001).

In February 1998, a New York State Police trooper stopped Anthony Dwayne Smith while he was driving. Upon searching Smith's truck, the trooper discovered four Brycos that had been purchased in Georgia within the previous two weeks. The trooper also found receipts documenting Smith's purchase of some 40 additional firearms from Georgia dealers, including the Gun Store. One of the guns Smith bought in Georgia was later recovered by New York Police Department officers inside a middle school in the Bronx.

*viii. United States v. Stephens,* No. 02–CR–351 (S.D.N.Y.2002).

A straw purchaser named Porchetta Lee bought 17 handguns from the Gun Store during a two-week period in June 2001. Lee promptly transferred the guns to Ronald Stephens, who drove them up to New York City, where he sold them on the street for many times their original retail price. Stephens sold at least two of the guns to an undercover police officer at a gas station in Brooklyn.

*ix. United States v. Gladney,* No. 03–CR–084 (N.D.Ga.2003).

A straw purchaser named Mohammad M. Gladney bought eleven firearms from the Gun Store, ten of them identical Cobra handguns purchased in a one-week period in January 2003. Later that month, Gladney mailed five Brycos that he had straw-purchased from another Atlanta-area gun dealer to New York.

*x. United States v. Atkinson,* No. 03–CR–223 (N.D.Ga.2003).

Monee Atkinson conspired with three others to buy guns from Atlanta-area dealers, including the Gun Store, and traffic them to New York for illegal resale. On March 27, 2002, Atkinson and one of her co-conspirators bought six handguns, mostly Bryco 9mm's, from the Gun Store.

*xi. United States v. Vinson,* No. 04–CR–112 (N.D.Ga.2004).

In a two-and-a-half-month period in 2003, Allen Vinson straw purchased 16 handguns from the Gun Store. As the City showed in its opposition to the previously filed and denied motions to dismiss, Vinson also straw purchased additional handguns from Adventure Outdoors.

*xii. United States v. Garcia–Diaz,* No. 05–CR–271 (N.D.Ga.2005).

Nelson Garcia–Diaz and three co-conspirators bought numerous guns from Atlanta-area dealers, including the Gun Store and Adventure Outdoors, to transport to Puerto Rico for illegal resale. The Garcia–Diaz ring bought seven identical Hi–Points from the Gun Store in two visits in January 2005 and April 2005.

*xiii. United States v. Seenarain,* No. 05–CR–328 (N.D.Ga.2005).

On June 10, 2005, Oudit Narain Seenarain bought four identical Hi–Points from the Gun Store. Several days later, Seenarain told the employees of another Atlanta-area gun dealer that sold him handguns that he intended to ship the guns to Guyana.

*xiv.* *United States v. Franklin,* No. 06–CR–221 (N.D.Ga.2006).

On October 25, 2005, Brian Franklin straw purchased six Hi–Points from the Gun Store. Several months earlier, Franklin sold two Hi–Points to a New Jersey resident.

*xv.* *United States v. Phillips,* No. 06–CR–287 (N.D.Ga.2006).

Benjamin Charles Phillips straw purchased five handguns, including four Hi–Points, from the Gun Store on February 11, 2005. Within two days of the purchase, Phillips had resold the guns to a New Yorker.

*xvi.* *United States v. Gobert,* No. 06–CR–288 (N.D.Ga.2006).

In a ten-day period in March 2006, Rory Stafford Gobert straw purchased five Hi–Points and two Cobrays from the Gun Store.

### c. Distribution Methods and Their Possible Effects on Crimes in New York—Multiple Sales

The straw purchase cases discussed above illustrate the Gun Store's willingness to sell numerous handguns, often of identical brands and models, to repeat purchasers. For example, Kareem Yusef Rogers (prosecuted under *United States v. Allen,* No. 00–CR–873 (N.D.Ga.2000)) straw purchased seventeen identical Brycos in two visits in July and August 2005; the Gun Store sold Mohammad M. Gladney ten identical Cobras in January 2003.

The New York Trace Data confirms that handguns sold by the Gun Store in multiple sales end up being recovered in crimes. For instance, two Phoenix Arms Ravens which the Gun Store sold on November 21, 1995 turned up in crimes in New York City within two years, one in a residential robbery. Five handguns, including two Brycos and two Lorcins, which the Gun Store sold on August 3, 1999, were recovered in New York City four days later; five more Brycos sold on November 23, 1999 were all recovered less than a month after sale.

### d. Time–to–Crime of Retailer's Guns Recovered in New York

Handguns sold by the Gun Store have a short time-to-crime—3.02 years (New York Data)—than the six-year average for all ATF trace requests. *See Blaustein & Reich, Inc. v. Buckles,* 365 F.3d 281, 285 (4th Cir.2004). Guns sold by the Gun Store were recovered in New York City as soon as one day after sale. Twenty five handguns sold by the Gun Store were recovered in crimes in New York within a month of sale; 41% of guns recovered in connection with crimes in New York were recovered within one year of sale and more than 72% of the guns recovered in crimes in New York were recovered within three years of sale.

### e. Sales Price and Types of Guns

Approximately one-third of the handguns the Gun Store sells are Saturday Night Specials. Of the guns sold by the Gun Store and recovered in New York (as shown in the New York Trace Data), 60% are Saturday Night Specials, as are nearly three-quarters of the guns identified by brand that the Gun Store sold to federally prosecuted straw purchasers.

### f. Crimes Committed in New York with Retailer's Handguns

Some of the reported crimes involving firearms sold by the Gun Store include the following:

- In December 2000, the recovery of a loaded gun purchased from the Gun Store used in a robbery at a Brooklyn grocery store;
- In November 1999, the recovery of a handgun purchased from the Gun Store used to shoot a 20–year–old livery cab driver;
- In July 2001, the recovery of a gun purchased from the Gun Store used to threaten a driver in a traffic dispute;
- In August 1999, the recovery of a 9mm pistol purchased from the Gun Store in the knapsack of a 16–year–old boy at a Manhattan public pool;
- In April 1999, the recovery of a .38–caliber gun purchased from the Gun Store that had been fired five or six times in the rear of a Bronx building; and
- In June 1996, the arrest of a man and woman for possession of cocaine with

intent to distribute, possession of a loaded 9mm handgun purchased from the Gun Store with intent to use, and child endangerment.

*See* Amended Compl. ¶ 171.

g. *Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets*

The Gun Store sold an estimated 7,000 handguns between 2000 and 2006, an average of 1,000 handguns per year. The National FOIA Data shows 534 guns traced to the Gun Store over a seven-year period (1991–1997), or 76.3 per year. About 7.63% of the total handguns sold by the Gun Store in any given year end up being recovered in connection with crimes. This percentage is probably even higher; data from the AGSF Report shows a greater number of guns, 646, recovered in a shorter period of time (5 years)—with nearly 13% of handguns sold each year by the Gun Store recovered in connection with crimes.

The New York Trace Data indicates that, between June 1996 and June 2002, 138 guns recovered in New York were traced to the Gun Store, an average just over 23 guns per year. Assuming the Gun Store's annual sales during this period were 1,000 handguns per year, 2.3% of the Gun Store's annual handgun sales are subsequently recovered in crimes in New York.

h. *Actions of Regulatory Authorities Related to the Gun Store's Distribution Practices*

The Gun Store met the criteria for issuance of a Demand Letter.

5. *Gallery Distributing—Mount Penn, Pennsylvania*

| Traces from criminal investigations to handguns that Δ sold | Δ's distribution methods and their possible effects on crime in NY (e.g., straw sales) | Time to crime of Δ's guns recovered in NY | Sales, prices, types, and intended uses of handguns that Δ sold | NY crimes committed with handguns that Δ sold | Δ's total unit and dollar sales of guns in US and NY markets | Actions of regulatory authorities related to Δ's practices |
|---|---|---|---|---|---|---|
| • 22 of Δ's guns were recovered in crimes nationwide from 1990-1997 (National FOIA Data).<br><br>• 50% of these handguns were recovered in crimes in states other than Pennsylvania (National FOIA Data).<br><br>• 18% of the guns were recovered in New York State (National FOIA Data).<br><br>• 25 of Δ's guns were recovered in New York (New York Trace Data).<br><br>• At least six more guns have been trafficked to New York City since 2002. Pl.'s Ex. G. | • Δ sold at least 37 guns to straw purchasers who trafficked them to New York City and elsewhere from 1998 to 2006. Pl.'s Ex. G.<br><br>• Repeated instances of multiple purchases. | • Average time for 25 guns = 1.7 years (New York Trace Data).<br><br>• 64% of guns recovered in New York were recovered within two years of sale (New York Trace Data).<br><br>• 88% of the guns recovered in New York were recovered within three years of sale (New York Trace Data). | • More than 15% of guns Δ sells are Sat. Night Specials; nearly 20% of guns Δ sold in the last three years are Sat. Night Specials. Pl.'s Ex. H.<br><br>• At least 60% of guns sold by Δ and recovered in New York had defaced serial numbers (New York Trace Data). | • At least one homicide, robbery, and multiple weapons offenses (New York Trace Data). | • Approximately 5,250 guns sold in US from 2000-06, of which an estimated 1% were recovered in crimes. Pl.'s Ex. H. | Δ met criteria for ATF Demand Letter. |

*a. Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant*

Based on National FOIA Data, 22 guns sold by Gallery Distributing were recovered in crimes nationally during the period 1990 to 1997. Guns sold by Gallery Distributing move in an interstate market: half of the guns sold by Gallery Distributing appearing in the National FOIA Data were recovered outside of Pennsylvania, with 18% of total recoveries made in New York.

During the period from March 1994 through October 2001, the New York Trace Data shows that at least 25 guns sold by Gallery Distributing were recovered in New York.

*b. Distribution Methods and Their Possible Effects on Crime in New York—Straw Purchases*

Gallery Distributing sold at least 37 guns to straw purchasers between 1998 and 2006. At least six of these guns were purchased for the purpose of resale in New York. Prosecutions of Gallery Distributing customers include the following:

*i. United States v. Morales,* No. 00–CR–738 (E.D.Pa.2000).

On October 25, 1999, Rosa Morales straw purchased two handguns from Gallery for her common-law husband, Manuel Santiago–Gonzalez. Several weeks later, she straw purchased another three handguns.

*ii. United States v. Ellison,* No. 03–CR–597 (E.D.Pa.2003).

Beginning in March 2000, Kinatai Ellison agreed to buy handguns for a convicted crack dealer named Luis Jose Arias. Ellison visited Gallery three times and straw purchased an Interarms/Star and two Glocks for Arias.

*iii. United States v. Basnight,* No. 05–CR–727 (E.D.Pa.2005).

In May 2004, Tyrone Basnight, a New Yorker, recruited his sister Rosalind and at least one other person to straw purchase handguns for him from Gallery Distributing. In less than a month, the straws had bought six guns for Basnight, who was prohibited from possessing firearms because of his extensive criminal record.

*vi. United States v. Haynes,* No. 06–CR–146 (E.D.Pa.2006).

Teanna Lanette Haynes visited Gallery Distributing three times in a two-week period in May and June 2004, each time straw purchasing a handgun.

*c. Distribution Methods and Their Possible Effects on Crimes in New York—Multiple Sales*

Many of Gallery Distributing's customers prosecuted for false statements related to their straw purchases bought multiple handguns per visit. For instance, Rosa Morales (mentioned above) bought two and three handguns during each of her visits to Gallery.

*d. Time–to–Crime of Retailer's Guns Recovered in New York*

Gallery Distributing's guns have a short time-to-crime: 1.7 years (New York Data)—compared to the six-year average for all ATF trace requests. *See Blaustein & Reich,* 365 F.3d at 285. Handguns sold by Gallery Distributing were recovered in New York City as soon as four days after sale. Sixty-four percent of guns sold by Gallery Distributing and recovered in New York were recovered within two years of sale, and 88% were recovered under the three-year threshold that ATF sets for guns suspected of being trafficked.

*e. Sales Price and Types of Guns*

Approximately 15% of the handguns sold by Gallery Distributing from 2000 to 2006 are Saturday Night Specials, with the figure for the past three years approaching 20%. While this percentage is relatively low compared with some of the other defendants' sales, guns sold by Gallery Distributing bear other significant indicia of trafficking; at least 60% of Gallery's guns recovered in New York had defaced serial numbers.

*f. Crimes Committed in New York with Retailer's Handguns*

Some of the reported crimes involving firearms sold by Gallery Distributing include the following:

- In November 1997, police arrested four men in the 67th Precinct in Brooklyn. The men had three handguns, one of which was purchased from Gallery Distributing, and five bags of marijuana with them;

- In March 1998, two men arrested in the 25th Precinct in Manhattan were found with five loaded and one unloaded firearms, one of which was purchased from Gallery Distributing;

- In October 2000, four males, one of whom was a 17–year–old boy, were arrested in the 10th Precinct in Manhattan and found with a loaded 9mm handgun purchased from Gallery Distributing;

- In April 2002, two men were arrested in the 30th precinct in Manhattan driving a stolen car. The police found cocaine in the car, as well as a stolen loaded .380–caliber handgun purchased from Gallery Distributing in the pocket of one of the suspects; and

- In April 2002, a 17–year–old boy was arrested in 40th Precinct in Bronx after firing a Smith & Wesson gun purchased from Gallery Distributing.

*See* Amended Compl. ¶ 153.

*g. Total Number of Handguns the Retailer Sold in the United States and it's Total Revenue from the United States and New York Markets*

Gallery Distributing sold an estimated 5,250 firearms between 2000 and 2006, or an estimated 750 firearms per year. New York Trace Data and federal prosecutions of Gallery Distributing customers show that just over 1% of Gallery's total firearms sold annually have been recovered in circumstances requiring that the gun be traced. The percentage of Gallery Distributing's handguns which are recovered in crimes will likely be much greater, since Gallery has not provided information about the number of handguns it sold within the 2000–2006 period, only the total number of all firearms it sold.

*h. Actions of Regulatory Authorities Related to Gallery Distributing's Distribution Practices*

Gallery Distributing meets the criteria for issuance of a Demand Letter.

**6. Old Dominion—Danville, Virginia**

| Traces from criminal investigations to handguns that Δ sold | Δ's distribution methods and their possible effects on crime in NY (e.g. straw sales) | Time to crime of Δ's guns recovered in NY | Sales prices, types and intended uses of handguns that Δ sold | NY crimes committed with handguns that Δ sold | Δ's total unit and dollar sales of guns in US and NY markets | Actions of regulatory authorities related to Δ's practices |
|---|---|---|---|---|---|---|
| • 75 of Δ's guns were recovered in crimes nationwide (National FOIA Data).<br><br>• More than 40% of these 77 guns were recovered in crimes in states other than VA – nearly half of those in New York (National FOIA Data).<br><br>• At least 20 guns were recovered in connection with crimes in New York State (New York Trace Data). | • Δ sold at least 18 additional guns to straw purchasers in 2002 and 2003 alone. Pl.'s Ex. I. | • Average time for 14 guns recovered in New York City = 3.0 years (New York Trace Data).<br><br>• 50% of guns recovered in crimes in New York City were recovered within two years of sale; 30% were recovered within one year (New York Trace Data). | • At least 27% of handguns Δ sells are Sat. Night Specials. Pl.'s Ex. J.<br><br>• 50% of guns sold by Δ and recovered in New York City were Sat. Night Specials (New York Trace Data).<br><br>• 81% of guns sold by Δ and identified in straw-purchase prosecutions were Sat. Night Specials. Pl.'s Ex. I. | • Robbery, at least two drug possession offenses, and multiple weapons possession offenses (New York Trace Data). | • 2,736 handguns sold in US from 2000–06 of which an estimated 1.1% were recovered in crimes in New York. Pl.'s Ex. J. | • Δ met criteria for ATF Demand Letter. |

a. Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant

Based on National FOIA Data, New York City is second only to Danville, Virginia, where Old Dominion is located, as a destination for Old Dominion crime guns. The National Data shows that 75 guns sold by Old Dominion were recovered in crimes nationally during the period 1990 to 1997. Old Dominion's role in serving an interstate market is evident—more than 40% of the guns sold by Old Dominion appearing in the National FOIA Data were recovered outside of Virginia, with nearly half of those turning up in New York State. During the period from March 1994 through October 2001, the New York Trace Data shows that at least 20 guns sold by Old Dominion were recovered in New York State.

b. Distribution Methods and Their Possible Effects on Crime in New York—Straw Purchases

In less than a year and a half, straw purchasers bought at least 18 guns from Old Dominion. Between April 2002 and October 2003, Jesse Hairston enlisted his wife, Deborah Barr–Hairston, and another individual to straw purchase firearms for him. Barr–Hairston and the co-conspirator bought 17 handguns, including 11 Hi–Points, from Old Dominion, several times on the same day, on a near-monthly basis. In May 2002, Annette Younger straw purchased a firearm from Old Dominion.

c. Distribution Methods and Their Possible Effects on Crime in New York—Multiple sales

The National FOIA Data shows that, prior to the adoption of Virginia's "one gun a month" law, Old Dominion regularly engaged in multiple sales of identical handguns. Multiple sales of identical guns on the same day are especially significant at Old Dominion because the dealer has a relatively low sales volume. Thus, for example, a November 21, 1994 purchase of three Lorcin .380's led to the recovery of one in New York City five days later, and the two others in Philadelphia and Danville within 10 months of sale; and a March 10, 1995 sale of two identical Bryco 9mm's led to the recovery, within a year and a half, of one gun in Hempstead, New York and the other in Danville.

d. Time–to–Crime of Retailer's Guns Recovered in New York

Old Dominion's guns recovered in the City have a much shorter time-to-crime—3.0 years (New York Data)—than the six-year average for all ATF trace requests. See Blaustein & Reich, 365 F.3d at 285. Guns sold by Old Dominion were recovered in New York City as soon as 24 days after sale. Thirty percent of Old Dominion guns recovered in New York were recovered within one year of sale, and fully half were recovered within two years—well under the three-year threshold that ATF sets for guns suspected of being trafficked.

e. Sales Price and Types of Guns

More than one-quarter of the handguns Old Dominion sells are Saturday Night Specials. Of the guns sold by Old Dominion and recovered in New York (as shown in the New York Trace Data), 50% are Saturday Night Specials, as are 51% of the Old Dominion guns documented in the National FOIA Data, and more than 80% of the guns sold by Old Dominion identified in straw purchase prosecutions.

One-quarter of the guns sold by Old Dominion that are recovered in the City have defaced serial numbers.

f. Crimes Committed in New York with a Retailer's Handguns

Some of the reported crimes involving firearms sold by Old Dominion include the following:

- In November 1996, the robbery of a 19 year old man in a Manhattan apartment by two men using a .380–caliber handgun purchased from Old Dominion;
- In March 1998, multiple shots fired on the streets of Manhattan from a handgun, and recovery of a loaded Hi–Point 9mm pistol purchased from Old Dominion;
- In February 2000, the recovery of a loaded Taurus 9mm pistol purchased from

Old Dominion and a large quantity of drugs from a Staten Island apartment in which children lived, including a 12 year old boy; the arrest of two men and two women present in the apartment for child endangerment;

- In November 1997, the recovery of a 9mm Ruger and four other handguns, one of which was purchased from Old Dominion, from suspects, including a Danville, Virginia resident, in a parked vehicle on a Brooklyn street; and

- In August 1997, the recovery of a .38–caliber handgun and a .40—caliber Smith & Wesson, one of which was purchased from Old Dominion, and drugs in a Staten Island home.

*See* Amended Compl. ¶ 207.

g. *Total Number of the Retailer's Handguns Sold in the United States and its Total Revenue from the United States and New York Markets.*

Old Dominion sold a total of 2,736 handguns between 2000 and 2006, an average of 391 handguns per year. The National FOIA Data shows 75 guns traced to Old Dominion over a seven-year period (1991–1997), or just under 11 per year. Assuming Old Dominion annual sales during this time period were no lower than its 2000 sales (299 handguns), this data indicates that close to 4% of handguns sold by Old Dominion during this time period would have been recovered in circumstances requiring that the gun be traced. More recent data shows an even higher percentage of Old Dominion's annual handgun sales are recovered in connection with crimes. The Discovery Traces provided by Old Dominion indicate that in a ten-month period ending in August 2007, 20 trace requests were made to Old Dominion, equivalent to 24 per year. Thus, more than 6% of Old Dominion's recent sales can be expected to be recovered in circumstances requiring that the gun be traced.

The New York Trace Data indicates that between June 1996 and June 2002, 20 guns were traced to the City from Old Dominion, an average of 3.34 guns per year. Assuming Old Dominion's annual sales during this period were no lower than 302 handguns per year, 1.1% of Old Dominion's handguns sold annually are subsequently recovered in crimes in New York. This number represents the average of Old Dominion's annual handgun sales from 1999–2002, the portion of this time period for which sales information is available. This is a conservative assumption since annual sales prior to 1999 are likely to be significantly lower based on Old Dominion's interrogatory responses which show a marked increase in sales between 1999 (215 handguns) and 2005 (512 guns).

h. *Actions of Regulatory Authorities Related to Old Dominion's Distribution Practices*

Old Dominion met the criteria for issuance of a Demand Letter.

**B. Law**

CPLR section 302(a)(3) confers long arm personal jurisdiction over a non-resident defendant who "(1) commits a tortious act outside New York, which (2) causes injury in New York. In addition, the plaintiff must show that the moving defendant (3) expects or should reasonably expect the act to have adverse consequences in the state and (4) derives substantial revenue from interstate commerce." CPLR 302(a)(3). Elements (1) and (2), tortious acts committed outside New York causing injury within the state, are fully alleged and supported. The critical issues are whether (3) the defendant would reasonably expect that its activities outside the state would cause adverse consequences in New York, and (4) it obtains substantial revenue from interstate commerce.

In addition, under the United States Constitution, the plaintiff "must ... establish that an exercise of jurisdiction would comport with federal due process," which "requires that (1) the defendant has sufficient 'minimum contacts' with the state of New York ... and (2) the assertion of jurisdiction is reasonable under the circumstances." *NAACP*, 2003 WL 21242939 at *3, 2003 U.S. Dist. LEXIS 8238 at *13.

*1. Long Arm Jurisdiction Generally*

a. *CPLR 302(a)(3)(ii)*

Personal jurisdiction in diversity cases is determined in accordance with the law of the

forum state, subject to federal due process constraints. *See, e.g., Savin v. Ranier,* 898 F.2d 304, 306 (2d Cir.1990); *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 223 (2d Cir.1963) (en banc); *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986). Jurisdiction in this case is asserted under section 302 of the New York Civil Procedure Law and Rules, the New York long arm statute. Section 302(a)(3)(ii) provides:

> [A] court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... commits a tortious act without the state causing injury to person or property within the state ... if he ...
>
> > (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

In order to assert jurisdiction under section 302(a)(3)(ii) plaintiff must show, as already noted, that: (1) the defendants committed a tortious act outside New York; (2) defendants' tortious activity caused injury to person or property inside New York; (3) defendants should have reasonably expected the act to have consequences in the state; and (4) defendants derive substantial revenue from interstate commerce.

*i. Legislative History*

There is no useful legislative history on the issue of which state's law defines what is a "tortious act without the state." In New York the most useful legislative history is usually found in the Governor's bill jacket. The jacket contains material gathered by the Governor's Counsel to assist the Governor in deciding whether to sign a bill passed by the legislature. In the present case, the jacket for Chapter 590 of 1966, approved June 14, 1966, the relevant provision, reveals great interest in the overall provision, but silence on the issue of the applicable state tort law. It contains:

1. The bills itself with the language already quoted;
2. A memorandum from the State Department of Law raising constitutional questions;
3. A letter from the New York County Lawyer's Association with an attached analysis;
4. A memorandum from the State Bar Association (David D. Siegel, Esq., Scrivener) on the bill and a competing measure;
5. A letter from the New York Law Revision Commission with attached memorandum;
6. A letter and memorandum from the State Administration of the New York Judicial Conference;
7. A letter and memorandum from the American Insurance Association opposing the bill;
8. An excerpt from commentary by Vincent C. Alexander;
9. Excerpts from the Second (1958) Preliminary Report of the Temporary Commission on the Courts;
10. An Advance Copy of the Fourth Preliminary Report of the Advisory Committee on Practice and Procedure;
11. Excerpts from the Sixth Report in the Senate Finance Committee Relative to the Revision of the Civil Practice Act;
12. Excerpts from the extensive Report of the New York Law Revision Commission for 1959 where the general provision recommended is broader than the one adopted since it reads (p. 71): "Commission of any act resulting in this state in death or in injury to person or property, if the corporation expected or should reasonably have expected that the act would have consequences in this state"; and
13. Excerpts from the Report of the Administrative Board of the Judicial Conference of the State of New York, July 1, 1964 through June 30, 1965, with an extensive Study of CPLR 302 in Light of Recent Judicial Decisions by Willis L.M. Reese, Professor of Law, Columbia University School of Law (p. 132), recommending that the state not "extend its jurisdiction as far as the constitution permits" (p.

136), but that it adopt the language of the present provision.

The article by Willis M. Reese and Nina Galston, *Doing An Act or Causing Consequences As Bases of Judicial Jurisdiction,* 44 IOWA L.REV. 249, 260 (1959), while generally supportive of the result reached in the instant case, is not helpful on the precise issue now presented. *See also* 2 Harold L. Korn et al., NEW YORK PRACTICE, CPLR 3–151 (2d ed.2007).

*ii. Cases*

On the issue of which states' definition of tortious should apply there are few cases that are helpful. The New York Court of Appeals in 2006, writing on a blank slate, required an analysis under section 302(a)(3), since a necessary condition to enforcement of a default judgment by a New York court is a determination that the rendering court had acquired personal jurisdiction over the defendant. *Sung Hwan Co., Ltd., v. Rite Aid Corp.,* 7 N.Y.3d 78, 817 N.Y.S.2d 600, 850 N.E.2d 647 (2006). *Sung Hwan* presented the question whether the Korean court had personal jurisdiction over Rite–Aid, the defaulting defendant, consistent with the law of personal jurisdiction as applied by New York courts.

The Court of Appeals noted that New York courts asked to enforce foreign judgments "typically looked to the framework of CPLR 302, New York's long-arm statute, using it as a parallel to assess the propriety of the foreign court's exercise of jurisdiction over a judgment debtor." *Id.* at 83, 817 N.Y.S.2d 600, 850 N.E.2d 647. As the Court explained,

> The specific inquiry here is whether Korea's exercise of jurisdiction over Rite Aid was consistent with New York law. For purposes of this inquiry, Korea is "the state" referenced in CPLR 302(a)(3) and the issue turns on whether Sung Hwan sufficiently alleged that Rite Aid committed "a tortious act" outside Korea, causing injury within Korea.

*Id.* at 84, 817 N.Y.S.2d 600, 850 N.E.2d 647.

Because Korea was "the state" for purposes of CPLR 302(a)(3), the *Sung Hwan* court's holding that the *law of the forum may serve as the law defining an act as*

*tortious,* even when the law of the place where the act occurred does not, establishes as a permissible basis for jurisdiction: (1) a "tortious act" as defined by New York's (i.e., the forum's) local law, without regard to the law of the state where the act was committed; and that (2) (what is conceded) *the law of the place where the complained of act occurred* may also serve as the law defining an act as tortious, so long as that definition is not contrary to New York policy. Neither definition violates federal due process.

Rite–Aid, the defendant in *Sung Hwan,* argued that CPLR 302(a)(3) would not have subjected it to Korean jurisdiction because there could be no "tortious act," where New York law (under which Rite–Aid acted), did not recognize the tort sued on by the Korean plaintiff. *Id.* at 84–85, 817 N.Y.S.2d 600, 850 N.E.2d 647. The Court of Appeals rejected that argument:

> The Korean court ruled in favor of Sung Hwan *and found that the conduct was tortious under Korean law* ... For purposes of establishing long-arm jurisdiction, a tort should be broadly defined to encompass one that causes economic injury. Here, although Korean law appears more expansive than New York law in imposing liability for economic loss under a tort theory, we see no reason to foreclose the use of CPLR 302(a)(3) as a basis for Korea's exercise of personal jurisdiction over Rite Aid merely because of this difference in the substantive tort law of the two jurisdiction.

*Id.* (emphasis added).

For purposes of establishing long-arm jurisdiction, it was held sufficient under CPLR 302(a)(3) that the act was deemed tortious under the law of the forum jurisdiction (Korea), and irrelevant that the act was not tortious under the law of the state in which the act took place (New York). Accordingly, in the present case, as long as the alleged acts of the defendants are tortious under New York law, *see NAACP v. Acusport,* 271 F.Supp.2d at 486–87, then CPLR 302(a)(3) is satisfied, regardless of whether the acts are also tortious under the laws of each defendant's jurisdiction. In fact, the acts com-

plained of are tortious in both the forum and the actors' states.

According to the Court of Appeals for the Second Circuit, which has construed *Sung Hwan* (in *dicta*), New York allows considerable freedom in defining what is tortious under CPLR 302(a)(3). *See Ehrenfeld v. Mahfouz,* 489 F.3d 542 (2d Cir.2007). In *Ehrenfeld,* the plaintiff argued that any "wrongful" act can serve as the "tortious" act required for 302(a)(3). The Court of Appeals rejected that position as overly broad, but used the term "pertinent jurisdiction" as appropriate for analysis.

> We recognize the possibility that the claim brought in New York need not be a tort under New York law to justify invocation of § 302(a)(3) to confer jurisdiction. *Nonetheless, there must be some basis for considering the defendant's actions to be tortious, either under the law of New York or some other pertinent jurisdiction.* In this case, plaintiff has shown no basis for considering the defendant's actions to be tortious. Therefore, the District Court properly found that it could not exercise personal jurisdiction over defendant under § 302(a)(3).

*Id.* at 551(citing *Sung Hwan,* 7 N.Y.3d at 84–85, 817 N.Y.S.2d 600, 850 N.E.2d 647) (emphasis added).

■■■ Thus, even in circumstances in which New York law is not violated, foreign law of a pertinent jurisdiction can suffice to supply the "tortious act" on which CPLR 302(a)(3) jurisdiction is predicated. This result is consistent with the statutory language, which includes nothing that would preclude the assertion of jurisdiction even where the injury-causing act is "tortious" only under the law of the foreign state. It can be assumed that for purposes of this rule the characterization of an act as tortious must not be so outlandish as to violate New York's public policy or due process of law.

### iii. Injury Causing Acts as Tortious in Foreign and Forum State

As to the first two elements necessary for jurisdiction to be exercised under section 302(a)(3)(ii), plaintiff alleges that the defendants' have sold guns in other states contributing to a public nuisance within the City of New York, causing harm to the City and its residents. The City contends that the sales practices are designed to allow firearms to be knowingly diverted from the retailer's legal primary local state market to the illegal secondary interstate market ending in New York and are therefore tortious in both defendants' states and the forum state.

A New York court could properly exercise jurisdiction over defendants pursuant to CPLR 302(a)(3) whether the tortious character of the acts alleged in the amended complaint is determined under New York law or the law of a defendant's home state. The amended complaint alleges that defendants' sales practices have created conditions that endanger the health and safety of the public at large in New York City. Georgia (the Gun Store), Pennsylvania (Gallery Distributing) and Virginia (Old Dominion) all recognize a cause of action for public nuisance, either under statute or common law. *See* Ga.Code. Ann. § 41–1–1 *et seq.* (2005); *Muehlieb v. City of Philadelphia,* 133 Pa.Cmwlth. 133, 574 A.2d 1208 (1990); *Breeding by Breeding v. Hensley,* 258 Va. 207, 213–14, 519 S.E.2d 369 (Va.1999).

A hypothetical illustrates the point. If X, in state A, fires a gun from state A into state A and also across the border into state B, negligently harming Y in state A, and Z in state B, X has committed a tort in state A against Y, and in state A *and* state B against Z. The acts now alleged to have been committed by defendants in their home states, A, by analogy can be compared to this hypothetical shooting of someone in state B, the forum state.

Although the City has omitted its three negligence causes of actions from the amended complaint, its nuisance causes of actions may be based upon facts supporting a claim of negligent conduct on part of the defendants. State and federal statutes and regulations set forth standards by which many products are manufactured, marketed and sold. Violation of such requirements is generally treated as negligence per se. This doctrine relieves the plaintiff of establishing specific common law negligence elements that the defendant owed a duty to the plaintiff and that the defendant breached a duty to the plaintiff. *See generally* RESTATEMENT

(SECOND) OF TORTS §§ 282–288 B (1965). United States jurisdictions, including those where the defendants and plaintiff reside, adhere to the rule that the violation of an applicable statutory provision constitutes negligence per se. *See e.g., Decker v. Gibson Prods. Co. of Albany, Inc.,* 679 F.2d 212, 213 (11th Cir.1982) (applying Georgia law); *Amick v. BM & KM, Inc.,* 275 F.Supp.2d 1378, 1381 (N.D.Ga.2003); *Scott v. Ford Motor Co.,* 229 F.3d 1143 (4th Cir.2000) (table); *O'Neil v. Windshire Copeland Assocs., L.P.,* 197 F.Supp.2d 507, 510 (E.D.Va.2002); *Williams v. Hill Mfg. Co.,* 489 F.Supp. 20, 22 (D.S.C. 1980); *Whitlaw v. Kroger Co.,* 306 S.C. 51, 410 S.E.2d 251, 252 (1991); *Austin v. Specialty Transp. Servs.,* 358 S.C. 298, 594 S.E.2d 867, 876 (Ct.App.2004); *Sikora v. Wenzel,* 88 Ohio St.3d 493, 727 N.E.2d 1277, 1280 (2000); *Chambers v. St. Mary's School,* 82 Ohio St.3d 563, 697 N.E.2d 198, 201 (1998); *Elliott v. City of New York,* 95 N.Y.2d 730, 734, 724 N.Y.S.2d 397, 747 N.E.2d 760 (2001); *Capital Mgmt. Co. v. Brown,* 813 A.2d 1094, 1099 (Del.2002); *Kauffman v. Schroeder,* 116 Ariz. 104, 568 P.2d 411, 414 (1977). Violations of federal and state gun control laws causing injury amount to negligence per se. *See e.g., Hetherton v. Sears, Roebuck & Co.,* 593 F.2d 526, 529–30 (3d Cir.1979); *West v. Mache of Cochran, Inc.,* 187 Ga.App. 365, 370 S.E.2d 169, 171 (1988); *Spires v. Goldberg,* 26 Ga.App. 530, 106 S.E. 585, (1921); *Coker v. Wal–Mart Stores, Inc.,* 642 So.2d 774, 776 (Fla.Dist.Ct. App.1994); *Rubin v. Johnson,* 550 N.E.2d 324, 329 (Ind.Ct.App.1990); *Lundy v. Hazen,* 90 Idaho 323, 411 P.2d 768, 770 (1966). The complaint's allegations regarding defendants' unlawful and unreasonable sales practices are sufficient to satisfy the "tortious act" requirement of CPLR 302(a)(3) under New York Law, in the first instance, or alternatively, under the laws of defendants' home states.

In view of the unanimity of the American courts' views on the issue of what constitutes a tort, there is no conflict in the laws of the relevant states that needs to be considered. In any event, the matter presents a question of statutory interpretation, not of possible conflicts of laws. There is no need in the instant case to determine CPLR 302's reach were the New York law of torts is signifi-cantly different from those of the state where the alleged primary tortious act occurred.

*iv. Burden of Proof*

██ Plaintiff need not present conclusive evidence of tortious conduct outside the state and harm in the state for jurisdictional purposes. *Cf. Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 460, 261 N.Y.S.2d 8, 209 N.E.2d 68 (N.Y.1965) ("[I]t cannot be made too clear that we are concerned solely with the problem of the court's jurisdiction over the person of a nonresident defendant and not with the question of his ultimate liability to a particular plaintiff; that issue is to be considered only after it is decided, on the basis of section 302, that the defendant is subject to the in personam jurisdiction of our courts."); *Sybron Corp. v. Wetzel,* 46 N.Y.2d 197, 204, 413 N.Y.S.2d 127, 385 N.E.2d 1055 (N.Y.1978) ("The issue at this juncture is only whether the action should die."); David D. Siegel, NEW YORK PRACTICE, 169 (4th ed.2005) ("the degree of proof needed to sustain jurisdiction is not as heavy as that needed to sustain a recovery on the merits").

██ The plaintiff's burden on a motion to dismiss for lack of jurisdiction is to establish the substantial likelihood that all the elements of jurisdiction can be proven by a preponderance of evidence at trial. *See, e.g., Peterson v. Spartan Indus., Inc.,* 33 N.Y.2d 463, 354 N.Y.S.2d 905, 310 N.E.2d 513 (N.Y. 1974) (burden to obtain discovery on jurisdictional facts); *Edelman v. Taittinger, S.A.,* 298 A.D.2d 301, 751 N.Y.S.2d 171(N.Y.App. Div. 1st Dep't 2002) (same); 2 Harold L. Korn et al, NEW YORK CIVIL PRACTICE, ¶ 302.12 (2d ed.2005) ("the plaintiff has the burden ultimately of proving beyond a preponderance of the evidence that jurisdiction over the defendant's person ... has been properly obtained"). This burden has been more than met by the City after extensive discovery on the point.

*v. Reasonable Expectation of Consequences in New York*

The requirement that defendants reasonably expect their conduct to cause harm in New York is intended to ensure that "it is

reasonable to require a defendant to come to New York to answer for tortious conduct committed elsewhere." *Ingraham v. Carroll,* 90 N.Y.2d 592, 598, 665 N.Y.S.2d 10, 687 N.E.2d 1293 (1997). But the consequences foreseen need not be those that are the precise subject of the lawsuit. *See In re DES Cases,* 789 F.Supp. 552, 570 (E.D.N.Y. 1992) (citing *Allen v. Auto Specialties Mfg. Co.,* 45 A.D.2d 331, 357 N.Y.S.2d 547, 550 (N.Y.App. Div.3d Dep't 1974)). Foreseeability requires "a discernible effort to directly or indirectly serve the New York market." *Schaadt v. T.W. Kutter, Inc.,* 169 A.D.2d 969, 970, 564 N.Y.S.2d 865 (N.Y.App. Div.3d Dep't 1991).

In the *DES Cases* the drug at issue, Diethylstilbestrol (DES), was found to be a generic, fungible consumer item. As a consequence of the interchangeable nature of the product and the nature of the market, "all DES manufacturers knew that their acts were having forum consequences in New York." *In re DES Cases,* 789 F.Supp. at 572. *Hamilton* held that for jurisdictional purposes handguns were also fungible and therefore the reasoning of *In re DES* applied to cases involving the manufacture and sale of handguns. 32 F.Supp.2d at 52.

The conclusion of the court in *In re DES Cases* was approved in *In re New York County DES Litigation,* 202 A.D.2d 6, 615 N.Y.S.2d 882 (N.Y.App. Div. 1st Dep't 1994). *In re New York County DES Litigation* held that "[a] consonant interpretation of C.P.L.R. § 302(a)(3)(ii) supports the conclusion that any manufacturer of DES, by its participation in the national marketing of a generic drug, should 'reasonably expect' its act of selling in the national market 'to have', as C.P.L.R. § 302(a)(3)(ii) puts it, 'consequences in the state.'" *Id.* at 11, 615 N.Y.S.2d 882.

▮ A retailer is less likely to be engaged in interstate commerce than a manufacturer or wholesaler. But, where, as here, a particular retailer in effect does engage in interstate commerce there is no need to differentiate it from a manufacturer or wholesaler for jurisdictional purposes.

A defendant's marketing of its products via the Internet has also been found particularly cogent in the CPLR 302(a)(3)(ii) jurisdictional analysis. *See Roberts–Gordon, LLC v. Superior Radiant Prods., Ltd.,* 85 F.Supp.2d 202, 217 (W.D.N.Y.2000) (finding jurisdiction over out-of-state defendant under CPLR 302(a)(3)(ii)); *NAACP,* 2003 WL 21242939 at *11, 2003 U.S. Dist. LEXIS 8238 at *36–37 (same); *Am. Network, Inc. v. Access America/Connect Atlanta, Inc.,* 975 F.Supp. 494, 498 (S.D.N.Y.1997) (nondomiciliary Internet service provider's statement on electronic home page that it could help customers "across the U.S." supported section 302(a)(3)(ii) long-arm jurisdiction); Shari Claire Lewis, *Long Arm Jurisdiction Through the Web,* New York Law Journal, August 7, 2007, at 5. In *NAACP,* the fact that a defendant marketed its products directly to the public ... through its website was specifically found to be "another marketing practice which allegedly increases the risk of inappropriate gun acquisition." 2003 WL 21242939, at *11, 2003 U.S. Dist. LEXIS 8238, at *36.

### vi. Derives Substantial Revenue from Interstate Commerce

▮ In order to be subject to New York long arm jurisdiction under section 302(a)(3)(ii) a defendant must also derive "substantial revenue from interstate or international commerce." There is no specific dollar threshold at which revenue becomes "substantial" for purposes of CPLR 302(a)(3)(ii). Instead, courts look either to the percentage of a party's overall revenue derived from interstate commerce, or to the absolute amount of revenue generated by a party's activities in interstate commerce, with each case to be decided on its own facts. *Pariente v. Scott Meredith Literary Agency, Inc.,* 771 F.Supp. 609 (S.D.N.Y.1991); *Ronar, Inc. v. Wallace,* 649 F.Supp. 310, 316–17 (S.D.N.Y.1986). Substantial revenue from interstate commerce may be shown by detailing extensive interstate recoveries of a defendant's guns and its repeated involvement in interstate gun trafficking.

Under section 302(a)(3), "[d]ismissal is inappropriate even where there is no proof that a defendant 'derives substantial revenue from interstate or international commerce,' where that knowledge is peculiarly under the control of the defendant,' and may come to

light in the course of subsequent discovery." *Mfg. Tech., Inc. v. Kroger Co.*, No. 06–CV–CV–3010, 2006 WL 3714445 at *3, 2006 U.S. Dist. LEXIS 90393 at *10 (S.D.N.Y.2006) (quoting *Tonelli v. Chase Manhattan Bank, N. A.*, 49 A.D.2d 731, 372 N.Y.S.2d 662, 663 (N.Y.App. Div. 1st Dep't 1975)) (brackets and quotation marks omitted). Where the precise magnitude of each moving defendant's interstate revenues is "peculiarly in their control," and also likely to have been concealed, given the illegal nature of the commerce in question, jurisdiction is more readily established. *See NAACP v. Acusport, Inc.*, 271 F.Supp.2d at 508 ("Diversion of firearms typically involves criminal behavior that the persons involved are trying to conceal").

### b. Due Process

Due process analysis requires that: (1) the defendant have sufficient "minimum contacts" with the forum state to justify the exercise of personal jurisdiction, and (2) the assertion of jurisdiction is reasonable under the circumstances. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560 (2d Cir.1996). "A court deciding whether it has jurisdiction over an out-of-state defendant under the Due Process Clause must evaluate the 'quality and nature' of the defendant's contacts with the forum state under a totality of the circumstances test ..." *Best Van Lines, Inc., v. Walker*, 490 F.3d 239, 242 (2d Cir.2006) (citations omitted).

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.' " *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal citations omitted). Individuals must be afforded fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign. This requirement allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit. *Id.*

### i. Minimum Contacts

Strict "territorial jurisdiction," *see Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877), is no longer as strong a principle as it once was. Boundaries are increasingly fluid and trading borders are determined more through the conduct and agreement of individuals, organizations, and governments than by lines that are drawn on maps. *See Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95, 131 (E.D.N.Y.2000) (notice and fair warning rather than strict territorial nexus governs); Harold L. Korn, *The Development of Judicial Jurisdiction in the United States: Part I*, 65 BROOK. L.REV. 935, 937 (1999) (current "challenges ... to ... traditional jurisdictional ... thinking"); Harold L. Korn, *Rethinking Personal Jurisdiction and Choice of Law in Multistate Mass Torts*, 97 COLUM. L.REV. 2183, 2184 (1997) ("[T]he Supreme Court must ... disavow the doctrine that ... the United States Constitution requires a territorial nexus between forum and defendant ... for the exercise of in personam jurisdiction"); Harold L. Korn, *The Choice of Law Revolution: A Critique*, 83 COLUM. L.REV. 772, 782 ff. (1983); Comment, *Mass Tort Jurisdiction and Choice of Law in a Multinational World Communicating by Extraterrestrial Satellites*, 37 WILLAMETTE L.REV. 145 (2001) ("fair venue controls in personam jurisdiction"). State lines are meaningful, but they are only one element to be taken into consideration when determining whether exercise of jurisdiction over a particular defendant is appropriate in particular circumstances.

Jurisdictional criteria used to measure a defendant's "presence" are, on the whole, not clear cut, and cannot be enforced in a mechanical fashion. *See Int'l Shoe Co.*, 326 U.S. at 319, 66 S.Ct. 154 ("It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative"). In addition to technical limitations, exercise of jurisdiction involves discretionary determinations based on practical considerations, burdens, and tactics. The

realities of economic relationships cannot be ignored. *See Bulova Watch Co. v. K. Hattori & Co.,* 508 F.Supp. 1322 (E.D.N.Y.1981).

An inflexible application of a traditional jurisdictional analysis that fails to take account of unique practical commercial factors does not effectively insure the fair and orderly administration of the law. *Cf. Babcock v. Jackson,* 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 ("Justice, fairness and the best practical result, may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation") (internal quotation marks and citation omitted); *cf. Hamilton,* 47 F.Supp.2d at 340 ("The points of distribution involved many states and vary from company to company; if the significant contact was the state of distribution, so many states' laws would be involved that consolidation of defendants would be impractical"). A reality-based pragmatic jurisdictional analysis is required.

■ "[T]o subject a defendant to a judgment in personam ... he [must] have certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.,* 326 U.S. at 316, 66 S.Ct. 154 (internal citations omitted). A defendant's conduct establishing minimum contacts must be purposefully directed toward the forum state, *see Burger King Corp.,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528, and its connection with the state should lead it to "reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) ("*Volkswagen*"). "A foreign corporation 'purposefully avails' itself of a particular forum where the corporation places its products into interstate commerce and reasonably foresees that those products will be delivered into that forum." *Kernan v. Kurz–Hastings, Inc.,* 997 F.Supp. 367, 374 (W.D.N.Y.1998).

In *Volkswagen,* plaintiff, a New York resident, purchased a car in New York State and was involved in an accident while driving through Oklahoma. Plaintiff then filed a products liability action in Oklahoma against the New York sellers. The regional distributor and local retailer moved to dismiss for lack of personal jurisdiction. The Supreme Court held that a fortuitous accident in Oklahoma involving a car sold in New York to a local consumer did not provide sufficient contacts between the moving defendants and the forum state.

In dictum the *Volkswagen* Court suggested that jurisdiction could be asserted over the international and national distributors of a product if the sale of the product was not "an isolated occurrence" but arose "from the efforts of the manufacturer or distributor to serve directly or indirectly the market for its product in" the forum state. 444 U.S. at 297–298, 100 S.Ct. 559.

On the basis of the language in *Volkswagen* "numerous courts in deciding whether the exercise of personal jurisdiction over an out of state defendant is appropriate have distinguished between retailers, who restrict their sales to a local market, and manufacturers and upstream distributors who seek a broader market for their product." *Taylor v. Uniden Corp. of Am.,* 622 F.Supp. 1011, 1014 (E.D.Mo.1985); *see also Lichon v. Aceto Chemical Co., Ltd.,* 182 Ill.App.3d 672, 131 Ill.Dec. 238, 538 N.E.2d 613 (Ill.App. 1st Dist.1989); *Violet v. Picillo,* 613 F.Supp. 1563 (D.R.I.1985); *Hedrick v. Daiko Shoji Co., Ltd., Osaka,* 715 F.2d 1355 (9th Cir. 1983); *Nelson by Carson v. Park Indus. Inc.,* 717 F.2d 1120 (7th Cir.1983).

"[C]ourts developing this pivotal distinction have explained, the key factors justifying a different jurisdictional rule are twofold." *Violet,* 613 F.Supp. at 1576. First, interstate distributors and manufacturers "place their products into the stream of commerce with either the subjective intention, or objective reason to know, that their products will be sold 'to a nationwide market, that is, in any or all states.'" *Id.* (internal citations omitted). "[T]he fact that these manufacturers or distributors place their products in a stream of commerce destined for sale through a broad interstate market, and reap the attendant benefits, renders them properly subject to suit in one of the states comprising that market." *Id.*

Second, local merchants serve a self circumscribed market and ordinarily have no

control over where the buyer takes their product after sale. *See id.* Interstate manufacturers and distributors, however, can act to limit the states in which their products will be sold thus structuring their primary conduct to provide "some minimum assurance as to where that conduct will and will not render them liable to suit." *Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559.

The nature of the product may have a bearing on the issue of minimum contacts. "[W]here a defendant deals in [ ] inherently dangerous products, a lesser showing than is ordinarily required will support jurisdiction." *Violet,* 613 F.Supp. at 1577; *see also Poyner v. Erma Werke GmbH,* 618 F.2d 1186, 1192 (6th Cir.1980). "[A] commercial defendant who deals in handguns should expect to be held accountable on a lesser showing than one who sells something as harmless as rubber bands. It is the type of product in which the state will have an inherent interest." *Delahanty v. Hinckley,* 686 F.Supp. 920, 925 (D.D.C.1986).

"[T]he scope of 'foreseeability' broadens when the enterprise giving rise to the action is subject to pervasive federal regulation." *Allied Towing Corp. v. Great E. Petro. Corp.,* 642 F.Supp. 1339, 1356 (E.D.Va.1986); *see also O'Neil v. Picillo,* 682 F.Supp. 706, 718 (D.R.I.1988); *cf. Marshall v. Barlow's, Inc.,* 436 U.S. 307, 314, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) ("businessmen engaged in [ ] federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade ... The businessman in a regulated industry in effect consents to the restrictions placed upon him"); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (finding the sale of firearms to be an industry of the type discussed in *Barlow's*); *Delahanty,* 686 F.Supp. 920 (personal jurisdiction could be properly exercised over the nonresident manufacturer and distributor of a crime gun that illegally entered the District of Columbia even though neither the manufacturer nor the distributor had agents or offices in the District of Columbia and neither was licensed to do business in the District of Columbia).

*Delahanty* held that printouts from the ATF and from the District of Columbia Metropolitan Police Department, which indicated the extent to which the defendants' products

were illegally trafficked and used by criminals, as well as defendants knowledge of these events, if they could be authenticated, would support a finding that "defendants' nationwide distribution scheme [had] been successful in indirectly distributing large numbers of their handguns in the District of Columbia." 686 F.Supp. at 921. The court rejected defendants' argument that it had not "purposefully availed" itself of the District of Columbia market. It held that it did not "matter that defendants' product reached the jurisdiction indirectly, so long as they [had] not sought to curtail their access to this market." *Id.* at 923.

#### ii. Reasonableness

■ In assessing whether an assertion of jurisdiction is reasonable, five factors will be evaluated: (1) the burden on defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of individual states and the interstate or international community in furthering their appropriate substantive social policies. *Asahi Metal Indus. v. California,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

Due process criteria are interrelated. Assuming that a constitutional threshold of contacts has been demonstrated, fewer contacts may be necessary where the "reasonableness" factors weigh heavily in favor of an exercise of jurisdiction. *See Metro. Life Ins. Co.,* 84 F.3d at 568 ("Thus, in assessing whether it may exercise jurisdiction over a particular defendant, a court must weigh the relative strengths and weaknesses of each requirement—that is, depending upon the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry.") (citing *Burger King Corp.,* 471 U.S. at 477, 105 S.Ct. 2174).

#### iii. State Interest

The forum state's interest was stressed in the *DES Cases,* 789 F.Supp. at 576. Strong

state interest as well as territorial contacts may provide the basis for exercise of constitutional in personam jurisdiction. Those interests need to be balanced against hardship of defendants. DES is a generic fungible consumer item. The DES market is "a common economic pond that knows no state boundaries. Substantial interjection of products at any point of the national market has ripple effects in all parts of the market." *In re DES Cases,* 789 F.Supp. at 576. For jurisdictional purposes handguns are also fungible, and therefore the reasoning of *In re DES Cases* applies to litigations involving the manufacture and sale of handguns. *Hamilton,* 32 F.Supp.2d at 52.

In order to assert personal jurisdiction under the state interest standard

I. The court must first determine if the forum state has an appreciable interest in the litigation, i.e., whether the litigation raises serious issues whose resolution would be affected by, or have a probable impact on the vindication of, policies expressed in the substantive, procedural or remedial laws of the forum. If there is an appreciable state interest, the assertion of jurisdiction is prima facie constitutional. II. Once a prima facie case is made, the assertion of jurisdiction will be considered constitutional unless, given the actual circumstances of the case, the defendant is unable to mount a defense in the forum state without suffering relatively substantial hardship.

*In re DES Cases,* 789 F.Supp. at 587.

If principle I is satisfied the assertion of jurisdiction is *prima facie* constitutional unless the exercise of jurisdiction is found to cause such substantial hardship to the defendant under principle II as to make exercise of jurisdiction unfair. "Although the test under Principle II does not shift the burden of persuasion to defendants, the court will ... assume fairness unless the defendant informs it of potential litigation burdens and the desirability of transfer or dismissal." *Id.* at 589. The extent of the interest must be balanced against the burden.

■ Evidence to be considered in determining the defendant's relative hardship includes: (1) the defendant's available assets; (2) whether the defendant has or is engaged

in substantial interstate commerce; (3) whether the defendant is being represented by an indemnitor or is sharing the cost of the defense with an indemnitor or co-defendant; (4) the comparative hardship defendant will incur in defending the suit in another forum; and (5) the comparative hardship to the plaintiff if the case were dismissed or transferred for lack of jurisdiction. *See id.* at 587. An additional factor, (6), is whether the activity of the defendant is illegal or against public interest.

### c. Cumulative Parallel Conduct

■ The illegal out-of-state activities of a single defendant alone may not suffice to establish jurisdiction. When, however, many individuals act through knowing parallel conduct, the extent of the combined harm may provide a basis for jurisdiction over each one. This is particularly true when each is, or should be, aware of the actions of the others. For example, one out-of-state upstream polluter may have insignificant impact on a down stream land owner. But the combined effect of many independent polluters on the owner or community could be devastating. "Each standing alone might amount to little or nothing. But it is when all are united ... that they become important, as factors, in producing the mischief complained of." *United States v. Luce,* 141 F. 385, 412 (C.C.D.Del.1905) (citation omitted).

In *Luce* the government had established a quarantine station whose inmates were discomforted by the foul intermingled odors wafted from a number of independently operated factories manufacturing fertilizer from fish refuse. Each enterprise's activities might not have been alone sufficiently offensive to warrant an injunction. But an injunction was called for against each of the factories to eliminate the total stench of the noxious parallel operations which together constituted a nuisance.

■ Where multiple actors contribute to a nuisance, equity can reach each one even though their conduct standing alone would not be actionable. *See, e.g., Warren v. Parkhurst,* 45 Misc. 466, 92 N.Y.S. 725 (N.Y.Sup. Ct.1904), *aff'd* 105 A.D. 239, 93 N.Y.S. 1009 (N.Y.App. Div.3d Dep't 1905), *aff'd* 186 N.Y.

45, 78 N.E. 579 (N.Y.1906). A common fact pattern is the discharge of waste or other substances into a stream by independently acting multiple upstream entities resulting in significant pollution or obstruction downstream. *See, e.g., Parkhurst,* 45 Misc. 466, 92 N.Y.S. 725; *Chipman v. Palmer,* 77 N.Y. 51, 55, 1879 WL 12206 (1879). As the court noted in *Parkhurst,* "the only injury to the plaintiff is caused by the noxious smells arising from the *'combined' sewage of all the defendants." Parkhurst,* 92 N.Y.S. at 725–726 (emphasis supplied). It went on to point out:

> Each defendant . . . knows that his continuous drainage, and the continuous drainage of each of the other defendants, at the same time and in the manner, causes a combined stench which destroys the usefulness of the plaintiff's property. Still each persists in contributing his part to the general stench.

*Id.* at 726. It noted that one defendant's discharge alone "might not be unreasonable," but "here, while each defendant acts separately, he is acting at the same time in the same manner as the other defendants, knowing that the contributions by himself and the others acting in the same way will result necessarily in the destruction of the plaintiff's property." *Id.* at 727.

Where multiple actors contribute to a nuisance and have knowledge of the others' conduct and of the effect of their actions in the aggregate, relief will be granted despite the fact that each defendant has acted independently. "If, necessary, in order to get at them, a court of equity may infer a unity of action, design, and understanding, and that each defendant is deliberately acting with the others in causing the destruction of plaintiff's property." *Id.; see also Hillman v. Newington,* 57 Cal. 56, 6 P.C.L.J. 88, 1880 WL 2037 (1880) (en banc) (independent diversion of water flow combining to constitute a serious problem for plaintiff).

"There is cooperation in fact in the production of the nuisance." *Parkhurst,* 93 N.Y.S. at 1010; *see also Woodruff v. North Bloomfield Gravel Mining Co.,* 16 F. 25, 28 (C.C.D.Cal.1883) (discharge of debris from various mines). "The question is whether there is a sufficient common bond among the . . . similarly situated persons . . . to author-

ize the court to interfere and give complete relief . . . against them all in one proceeding and thus avoid a multiplicity of suits." *Parkhurst,* 93 N.Y.S. at 1010.

While deliberate concert of action or common design may be necessary in some instances to allow for jurisdiction over smaller defendants in a foreign jurisdiction, "passive concert or passive community is, in certain circumstances, enough." *Town of Sharon v. Anahma Realty Corp.,* 97 Vt. 336, 123 A. 192, 192 (1924) (combination of acts raising ice level when each defendant's acts would have been innocuous but for the acts of others). Defendants in such cases can not be allowed to avoid liability by contending that their isolated acts are not sufficient for the court to gain jurisdiction when they act with knowledge that others are acting in the same way. *See, e.g., Parkhurst,* 92 N.Y.S. at 725; *Sloggy v. Dilworth,* 36 N.W. 451, 453 (Minn. 1888) (flooding of lands). "One drop of poison in a person's cup may have no injurious effect. But when a dozen, or twenty or fifty, each put in a drop, fatal results may follow. It would not do to say that neither was to be held responsible." *Luce,* 141 F. at 412; *Cf.* Agatha Christie, *Murder on the Orient Express* (1934) (many independent murders of the same person, but the defendants were in concert).

Where the defendants reside in different jurisdictions, the plaintiff would be without effective recourse in any jurisdiction without aggregation of the defendants' acts so all could be sued together in one place. "In such a case, all who act must be held to act jointly." *Hillman v. Newington,* 57 Cal. at 64.

> No inconvenience or additional costs can result to the several defendants . . . from being joined with others, who also contribute to the . . . nuisance by . . . independent action . . . but ultimately, cooperat[e] to produce the nuisance. . . . [I]t is convenient to dispose of it in one case . . . and the administration of justice is . . . facilitated. In fact it is the only adequate mode of proceeding in cases like this.

*Woodruff,* 16 F. at 30. *Cf.* The American Law Institute, *Intellectual Property: Principles Governing Jurisdiction, Choice of Law,*

*And Judgments in Transnational Disputes, § 206 Personal Jurisdiction over Multiple Defendants* (Proposed Final Draft 2007) (expanding the personal jurisdiction of the courts in cases with multiple out-of-state defendants from different states where there is sufficient connection between the case and the forum state, noting that such expansion is warranted when it avoids the risk of inconsistent judgments and the forum state is closely related to the entire dispute).

### 2. Long Arm Jurisdiction in Gun Cases

Ten factors were recognized in *NAACP* as bearing on prudential aspects of personal jurisdiction analysis applicable to gun manufacturers and distributors. These factors (the "*NAACP* Factors") are:

1. crimes committed in New York with the defendant's handguns;

2. total number of handguns the defendant manufactured or sold in the United States;

3. number of handguns sold by the defendant in New York;

4. value of gun-related products sold by the defendant in New York;

5. number of "trace" handguns linked to criminal investigations in New York that are attributable to the defendant;

6. sales price of the defendant's handguns (*e.g.*, very high priced collectors' guns not designed for use);

7. type of gun and its intended use (*e.g.*, very large handguns used in hunting large game such as heavy weapons requiring two hands or a stand);

8. connection with the defendant's related companies;

9. distribution methods and their possible effects on crimes in New York; and

10. the defendant's total revenue from the United States and New York markets.

*NAACP*, 2003 WL 21242939 at \*4, 2003 U.S. Dist. LEXIS 8238 at \*17–18. Among the ten criteria, the "total number of handguns ... sold and traced in New York ... and distribution practices with a possible effect on crime in New York ... [are] 'particularly salient.'" *Id.* at \*4–5, 2003 U.S. Dist. LEXIS 8238 at \*18–19.

The following seven "Retailer *NAACP* Factors" are those most relevant to retail gun establishments:

1. Number of "trace" handguns linked to criminal investigations in New York and elsewhere that are attributable to the defendant;

2. Distribution practices and their possible effects on crimes in New York;

3. Time-to-crime of the retailer's guns recovered in New York (a critical factor not considered in *NAACP*);

4. Sales price, type of gun and the intended use of the retailer's handguns (e.g., very high priced collectors' guns not designed for use or very large handguns used in hunting large game such as heavy weapons requiring two hands or a stand) (combining *NAACP* factors 6 and 7);

5. Crimes committed in New York with the retailer's handguns;

6. Total number of handguns the retailer ... sold in the United States and retailer's total revenue from the United States and New York markets; and

7. Actions of regulatory authorities related to the retailer's distribution practices (a factor not considered in *NAACP*).

### C. Application of Law to Facts

■ Under New York general long arm jurisdiction jurisprudence and its application in gun cases and the facts found for purposes of this motion, exercise of personal jurisdiction under CPLR 302(a)(3)(ii) is warranted. The City has made a persuasive showing of personal jurisdiction with its jurisdictional allegations and supporting data. Its averments of credible facts are sufficient to establish jurisdiction over each moving defendant. *See NAACP*, 2003 WL 21242939 at \*2–3, 2003 U.S. Dist. LEXIS 8238 at \*11–12.

Four aspects of the City's claims differentiate the instant case from the garden variety long-arm jurisdiction cases addressing one-time personal injuries or one-time commercial disputes between private parties:

First, the City has assembled, as to each moving defendant, strong evidence of a continuous, long-standing course of conduct having adverse effects in New York City. This evidence documents, for each defendant, a decade-long, if not longer, practice of facilitating the illegal sale of guns for movement into the illegal New York City market. Whether through specific federal prosecutions of gun trafficking, or through gun traces and trace requests that year after year follow from straw purchases, the City has demonstrated that each moving defendant has maintained a long, profitable and continuing commercial relationship affecting people in the State of New York.

Second, personal jurisdiction is sought here not simply to vindicate an individual right or to resolve an individual commercial dispute. Rather, it is sought to protect the safety of an entire community.

Third, the necessarily clandestine nature of the particular commerce at issue—with moving defendants aware that their participation in interstate gun sales could potentially subject them to criminal and civil prosecution—means that the evidence of that interstate commerce is unlikely to be openly displayed. Examination of defendants' financial statements and other records will seldom tell the full story. Rather, proof of interstate commerce requires reliance upon sound inferences drawn from frequently fragmented information.

Fourth, the parallel conduct, which each moving defendant knew about, jointly constitutes a major aspect of interstate commerce and has a particularly harmful effect on the safety of New Yorkers. It is well known in the industry that local retail straw sales send guns into other states where they are used in crimes.

The only published decision to date to analyze the exercise of personal jurisdiction over an out-of-state gun *retailer* in a New York public nuisance case has held that the requisite *prima facie* case could be established inferentially through "allegations that there have been crimes committed in New York with the defendant's guns; that there are a significant number of traces linked to criminal investigations in New York that are attributable to the defendant's conduct; and

that defendant's distribution practices have a substantial effect on crime in New York." *Johnson,* 304 F.Supp.2d at 401. The City's amended complaint rests sufficiently on such allegations. *See, e.g.,* Amended Compl. at ¶¶ 141–174; 197–209 (detailing for each defendant the number of traces, particular crimes connected, and indicia of trafficking). Those allegations, as supplemented with extensive evidence, provide more than sufficient basis for finding each moving defendant subject to New York long-arm jurisdiction— a basis stronger than that presented in *Johnson.*

Moving defendants argue unconvincingly that plaintiff has not established that each defendant committed a tortious act without the state. The Gun Store and Gallery Distributing argue that although the City has alleged that defendants engaged in simulated straw purchases, it fails to allege that illegal handguns recovered in New York City over the course of years were a result tortious acts of the defendants, i.e., straw purchases. *See* The Gun Store's and Gallery Distributing's Motion to Dismiss at 14–15. To satisfy the first element of CPLR 302(a)(3) the "plaintiff need not make a prima facie case in tort." *Feinberg v. Deloitte & Touche,* No. 91–CV–4496, 1993 WL 330508, 1993 WL 330508, 1993 U.S. Dist. LEXIS 11749 (S.D.N.Y. Aug.25, 1993). The plaintiff need only establish that the out-of-state conduct attributable to each defendant gives rise to a claim in tort. *See Evans v. Planned Parenthood of Broome County Inc.,* 43 A.D.2d 996, 352 N.Y.S.2d 257, 257 (N.Y.App. Div.3d Dep't 1974). The court finds that at this stage of litigation, there is sufficient evidence to find a knowing violation of federal law on part of the defendants when they sold the handguns which ended up in New York City, and therefore a tort was committed by each of the defendants in its home state.

To the extent that defendants contend that they had no reason to expect that their sales of handguns outside of New York would produce lethal consequences in New York, that argument was rejected nearly ten years ago in *Hamilton:* "[T]here is significant publicly available evidence such that any firearms distributor, by virtue of being in that busi-

ness, should know of or foresee the existence of an underground market which transports guns from the Southeast to states in the Northeast, including New York." 32 F.Supp.2d at 63. In light of the facts and analysis in *Hamilton* it should come as no surprise to any one participating in gun marketing that jurisdiction in New York might lie for illegal gun sales in other states.

The City's allegations and proof demonstrate the kind of "purposeful availment" that was absent in *Volkswagen,* 444 U.S. 286, 100 S.Ct. 559. Alleged, with abundant factual confirmation, are the facts that: (i) each moving defendant has engaged in straw sales, (ii) it knew, or should have known, that the apparent purchaser was acting on behalf of a prohibited purchaser, and (iii) it knew, or should have known, that many of the guns it was selling illegally would be, and were, trafficked to New York and thereafter recovered in crimes committed in New York City. *See* Amended Compl. ¶¶ 60, 270–73.

Moving defendants assert that they should not be subject to New York long arm jurisdiction because they do not derive substantial revenue from interstate or international commerce. The City has provided an ample factual basis for concluding that each moving defendant earns substantial revenue from interstate commerce—revenues more than sufficient to subject them to suit in New York.

Unfounded is defendants contention that this court's exercise of personal jurisdiction over them would somehow offend Constitutional Due Process. First, defendants' longstanding contacts with New York—supplying guns over the course of more than a decade to individuals who traffic these guns to New York for criminal purposes—are far more than "minimal." Second, case law establishes that fewer contacts with New York are required when, as here, the cumulative weight of the favor jurisdiction in this State. *NAACP,* 2003 WL 21242989 at *3–4, 2003 U.S. Dist. LEXIS 8238 at *15–16.

The evidence analyzed under applicable jurisdictional criteria satisfies both New York's long-arm statute and federal due process. Given the information available to firearms retailers concerning straw purchases and the illegal traffic in guns, along with defendants' alleged sales practices, defendants' should have reasonably expected their acts to have serious adverse consequences in New York.

While the defendants in the present case are retailers, and not manufacturers like the defendants in *In re DES Cases* and *Hamilton,* they are participating in what is effectively a national illegal market, subject to national as well as state statutory control. The nature of the firearms market, especially the secondary illegal firearms market, ensures that sales made in one part of the country will impact other areas of the nation. *See* Philip J. Cook et al., *Guns and Violence Symposium: Regulating Gun Markets,* 86 J.CRIM. L. & CRIMINOLOGY 59, 71 (1995) (noting that the "primary and secondary markets [for guns] are closely linked, like the analogous market[ ] for ... prescription drugs"). The fact of gun trafficking and the imbalance in the restrictions placed on guns from state to state facilitates a flow of guns from states with less restrictions on firearms to states, like New York, that have strict regulations. *See* Richard Lacayo, *Running Guns up the Interstate,* TIME, Feb. 6, 1989, at 24 ("the driving force behind domestic arms smuggling is the discrepancy among state laws").

It is appropriate to analogize the defendants in this case to interstate distributors. The factual circumstances present indicate that each defendant should have known—as in fact they likely did know from their knowledge of out-of-state trace requests—that their sales practices were funneling guns into a stream of commerce broad enough to include New York. Unlike the retailer involved in *Volkswagen,* these defendants did not serve a self circumscribed market; they essentially adopted the role of distributors in the illegal interstate secondary gun market. Whereas the car retailer in *Volkswagen* was not enhanced in his economic posture by the consumer's travel through Oklahoma, the defendants in this case do benefit from the gun traffickers' crossing of state lines since it enables them to sell more guns. Here, the nature of the relationship between the buyer and seller as well as the nature of the product dictated that defendants' guns would be likely to end up in other states including New York. *See Hall v. Zambelli,* 669 F.Supp. 753 (S.D.W.Va.1987).

Like interstate distributors, these defendants could have structured their conduct to provide themselves "minimum assurance as to where that conduct [would] and [would] not render them liable to suit," by not selling their guns allegedly, recklessly and negligently. "[H]aving failed to structure their primary conduct to provide themselves with minimal assurance as to where they would be compelled to defend ... litigation, defendants may not now reasonably claim unfair surprise or undue burden in being called to answer in a state where their products are alleged to have caused harm." *Violet*, 613 F.Supp. at 1578. When a firearms retailer knows that due to its inappropriate sales practices its product will be "transferred from hand to hand and transported from state to state, [it] cannot reasonably claim that [it is] surprised at being held to answer in any state for the damages the product causes." *Poyner*, 618 F.2d at 1189 (quoting *Keckler v. Brookwood Country Club*, 248 F.Supp. 645, 649 (N.D.Ill.1965)). In this case, while the defendants have no officers or agents in New York and are not licensed to do business in New York, they knowingly serve the New York illegal gun market.

The Supreme Court has questioned whether simply placing a product in the stream of commerce is, by itself, sufficient to establish the minimum contacts with a forum state. *See Asahi Metal*, 480 U.S. at 112, 107 S.Ct. 1026; *Volkswagen*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490. But defendants here have done more than simply place handguns in the stream of commerce. The illegal longstanding sales conduct of the defendants is sufficient to provide the minimum contacts necessary for an exercise of personal jurisdiction by the State of New York.

All "reasonableness" factors strongly support this court's exercise of personal jurisdiction:

1. "The interests of the forum state in adjudicating the case," which here strongly favors proceeding in New York, where substantial and widespread injury is being suffered;

2. Plaintiff's "interest in obtaining convenient and effective relief," here strongly favors a single litigation in New York, rather than piecemeal litigation in Georgia, Ohio Pennsylvania, South Carolina and Virginia. *See City of New York v. Cyco.net, Inc.*, 383 F.Supp.2d 526, 545 (S.D.N.Y.2005) ("Were this Court to order transfer, Plaintiff would be forced to litigate this action in four, perhaps five, judicial districts across the country. The Court will not engage in such a waste of resources");

3. "The interstate judicial system's interest in obtaining the most efficient resolution of the controversy," here favors a single forum in New York, rather than piecemeal litigation in other states;

4. "The shared interest of the states ... in furthering appropriate ... substantive social policies," here favors enforcement by a New York court of the vital policy of preventing sales of firearms to unauthorized persons, and thus reducing risk of gun-related crime in New York;

5. The "burden on defendant" is the only factor that arguably favors proceeding in moving defendants' home states. But here it is overwhelmed by the other relevant factors. In any event, since all defendants have essentially the same defenses it will be more convenient to all defendants, plaintiff and the courts to try the case in one district at one time.

There is no evidence that these defendants would suffer undue hardship from defending this suit in New York. From the proceedings so far it is apparent that competent New York counsel are available to litigate this suit on all the defendants' behalf. Modern communications and transportation methods ease the burden of litigating in another state. *See e.g., Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

"In the absence of an indication that the defendant[s] [are] without adequate resources, there is no basis for concluding that defendant[s] will be excessively burdened by a New York trial and, *a fortiori*, no reason to believe that defendant[s'] burden will exceed the burden on plaintiff[ ] of a dismissal." *In re DES Cases*, 789 F.Supp. at 594.

New York has a strong interest in the safety its residents and territory from handgun violence as well as in regulating the illegal flow of handguns into its territory. By enacting strong gun control laws to protect its citizens from gun-related crimes New York has expressed a special public policy interest in the subject matter of this litigation. The activities which the defendants' are alleged to be involved in are illegal and against the public interest in all states. Their alleged illegal practices hinder the ability of New York and the federal government to regulate the sale and ownership of firearms in accordance with extant statutes.

### D. Conclusion as to Personal Jurisdiction

The motions to dismiss for lack of personal jurisdiction by defendants Gallery Distributing, the Gun Store, and Old Dominion are denied.

## VI. MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

### A. Defendants' Arguments

The Adventure Outdoors group argues that the City's amended complaint be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because the City's nuisance claim is based on a violation of New York Penal Law § 400.05, a statute which defendants are not capable of violating since their conduct took place outside of New York. *See* Adventure Outdoors Group's Motion to Dismiss at 5–7. These defendants further argue that their alleged violation of New York Penal Law § 240.45 does not state a claim for nuisance because the statute is only applicable to conduct taking place in New York. *Id.*

The Gun Store and Gallery Distributing argue that the amended complaint should be dismissed pursuant to the Protection of Lawful Commerce in Arms Act, Pub.L. No. 109–92, 119 Stat. 2095 ("PLCAA"). *See* The Gun Store's and Gallery Distributing's Motion to Dismiss at 3–8. They further argue that the amended complaint does not state a claim upon which relief may be granted because the City's definition of "straw purchase" is "loose" and "too vague to permit the defendants or the fact finder from understanding

the nature of the alleged nuisance to be abated." *See id* at 10. These defendants further argue that the amended complaint fails to specify "a mechanism by which the nuisance is to be identified, nor the mechanism by which it might be abated." *See id.*

Old Dominion argues that the City is improperly seeking to apply New York law "extraterritorially," so as to assert both personal jurisdiction and an injunctive remedy over a foreign defendant. *See* Old Dominion's Motion to Dismiss at 7. According to Old Dominion, the extraterritorial application of New York law violates due process, comity and state sovereignty. *Id* at 14 ff It contends that liability can attach only if it is found to have violated Virginia law—i.e., that the "tortious" nature of the "tortious conduct" serving as a jurisdictional predicate under CPLR § 302(a)(3) must be determined under the law of Virginia, not New York. *Id.*

### B. Rule 12(b)(6): Standard and Scope

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for "failure to state a claim upon which relief may be granted." Fed.R.Civ.P. 12(b)(6). The Supreme Court has recently pronounced that to withstand a motion to dismiss for failure to state a claim, a plaintiff need plead only "enough facts to state a claim to relief that is *plausible* on its face." *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, ——, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007) (emphasis added). The Court also stressed the importance of notice pleading standard: "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests'...." *Id.* at 1964 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Court of Appeals for the Second Circuit has interpreted *Twombly's* "plausibility" standard:

> After careful consideration of the [Supreme] Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading,

but is instead requiring a flexible "plausibility standard," which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible. *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir.2007); *see also id.* at 155–58 (discussing the *Twombly* decision). A court must accept the plaintiff's factual allegations as true, drawing all reasonable inferences in plaintiff's favor. *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996). Sufficient facts are alleged to render the City's claims plausible under *Twombly* and *Iqbal.*

## C. Common Law Public Nuisance

### 1. Law

 Under New York law, a claim for public nuisance may lie against members of the gun retailing industry whose marketing and sales practice lead to the diversion of large numbers of firearms into the illegal secondary gun market. *See NAACP*, 271 F.Supp.2d at 449–51. In *NAACP* extensive discovery and detailed expert testimony demonstrated that gun manufacturers, importers and distributors were responsible for the creation of a public nuisance and that they could, voluntarily and through easily implemented changes, substantially reduce the harm occasioned by the illegal possession and use of handguns. *Id.* at 446. A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with the use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977) (citations omitted). The offense, "being one common to the public, should be enjoined at the suit of the sovereign's law officer." *N.Y. Trap Rock Corp. v. Town of Clarkstown*, 299 N.Y. 77, 85 N.E.2d 873, 877 (1949); *see also N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1361 (2d Cir.1989) ("[T]he City [of New York] is a proper party to bring an action to restrain a public nuisance that allegedly may be injurious to the health and safety of its citizens."). Whether conduct "constitutes a public nuisance must be determined as a question of fact under all the circumstances." *N.Y. Trap Rock Corp.*, 85 N.E.2d at 875.

The illegal possession and use of handguns in New York may be found to constitute a public nuisance:

> There can be no dispute that the unlawful use of handguns constitutes a public nuisance ... Moreover, the injuries and deaths that result from such activities clearly constitute a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons.

*People v. Sturm, Ruger & Co., Inc.*, Index No. 402586/00 at 20, 2001 WL 35994963 (N.Y.Sup.Ct. Aug. 10, 2001), *aff'd*, 309 A.D.2d 91, 761 N.Y.S.2d 192 (N.Y.App.Div.2003), *leave to appeal denied*, 100 N.Y.2d 514, 769 N.Y.S.2d 200, 801 N.E.2d 421 (N.Y.2003) ("*Sturm, Ruger*"); *see also* N.Y. Penal Law § 400.05(1) ("Any weapon specified ... when unlawfully possessed, manufactured, transported or disposed of, or when utilized in the commission of an offense, is hereby declared a nuisance.").

#### a. Conduct of the Defendants Creating, Contributing to, or Maintaining the Nuisance

 In private nuisance cases, a plaintiff must prove fault by showing either intentional or negligent conduct on the part of the defendant or that the defendant engaged in ultra-hazardous activity justifying the imposition of strict liability. *See* RESTATEMENT (SECOND) OF TORTS § 822. In public nuisance cases, in particular those brought by a public authority, allegations of fault have generally been found to be irrelevant under New York law. *See, e.g., State v. Shore Realty Corp.*, 759 F.2d 1032, 1051 (2d Cir.1985) (applying New York law); *United States v. Hooker Chem. & Plastics Corp.*, 722 F.Supp. 960, 965–66 (W.D.N.Y.1989) (applying New York law); *State v. Fermenta ASC Corp.*, 160 Misc.2d 187, 608 N.Y.S.2d 980, 985 (N.Y.Sup. Ct.1994); *see also* Robert Abrams & Val

Washington, *The Misunderstood Law of Public Nuisance: A Comparison with Private Nuisance Twenty Years After Boomer*, 54 ALB. L.REV. 359, 373 (1990) ("New York courts have historically required no finding of negligence, intentional conduct, or an ultrahazardous activity in assigning liability for a public nuisance—the decisions carry with them the assumption that liability is strict."); *cf. NAACP*, 271 F.Supp.2d at 487 (in public nuisance action brought by private plaintiff, allegations of intentional or negligent conduct are necessary). While most of the cases in which allegations of fault were not required involved actions brought by the state concerning the release of hazardous wastes into the environment, the no fault rule also finds support in other public nuisance actions brought by a public entity. *See, e.g., City of Rochester v. Premises Located at 10–12 S. Wash. St.*, 180 Misc.2d 17, 687 N.Y.S.2d 523, 526 (N.Y.Sup.Ct.1998) (in action to have nightclub declared a public nuisance, owner could be held liable irrespective of fault or negligence). The absence of a fault standard is appropriate in the public nuisance context: "The public should not be made to suffer an unreasonable interference with its rights merely because the entity responsible for the interference is acting nonnegligently and without bad intent." *Abrams & Washington, supra*, at 370.

Judicial and scholarly opinions do not always distinguish between public and private nuisance. As a result, the fault concepts in private nuisance actions are sometimes superimposed onto public nuisance actions. *See id.* at 367–68. In a classic public nuisance case, *Copart Indus. v. Consol. Edison Co.*, 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968 (N.Y.1977), the court refers to "nuisance, either public or private, based on negligence," thus implying that traditional fault concepts apply to public nuisance. *Abrams & Washington, supra*, at 363–64 n. 31 (citing *Copart Indus.*, 394 N.Y.S.2d 169, 362 N.E.2d at 972). The Restatement, as well, has been criticized for improperly failing to distinguish between public and private nuisance in its suggestion, in the comment following the general rule of liability for private nuisance, that the law of public nuisance is the same in most circumstances. *See id.*

at 367–68 (citing RESTATEMENT (SECOND) OF TORTS § 822, cmt. a).

Because the law of public compared to private nuisances is unclear and because the New York Court of Appeals has never spoken definitively on whether traditional fault concepts are applicable in public nuisance suits, the concepts of intentionality and negligence require examination.

*i. Intentional Conduct*

A defendant acts intentionally if it acts for the purpose of causing an interference with a public right or knows that such interference was resulting or is substantially certain to result from its conduct. *See Copart Indus.*, 394 N.Y.S.2d 169, 362 N.E.2d at 972–73; *McKenna v. Allied Chem. & Dye Corp.*, 8 A.D.2d 463, 188 N.Y.S.2d 919, 924 (N.Y.App. Div. 4th Dep't 1959); RESTATEMENT (SECOND) OF TORTS § 825. A general awareness that harm is resulting or likely to result does not satisfy the intentionality requirement. *See Finch v. Swingly*, 42 A.D.2d 1035, 348 N.Y.S.2d 266 (N.Y.App. Div. 4th Dep't 1973); RESTATEMENT (SECOND) OF TORTS § 825, cmt. c. If a defendant becomes aware, however, that harm is resulting from its conduct and continues to act in the same manner, it may have acted with the requisite intent to contribute to a public nuisance. *See* RESTATEMENT (SECOND) OF TORTS § 825, cmt. d ("[W]hen the conduct is continued after the actor knows that the invasion is resulting from it, further invasions are intentional.").

The intentionality requirement in the context of a suit against the gun industry requires that a firearms "manufacturer, importer or distributor knows or is substantially certain that its marketing practices have a significant impact on the likelihood that a gun will be diverted into the illegal market and used in crime, and that substantial harm to the public will result." *NAACP*, 271 F.Supp.2d at 488; *see also id.* at 492 ("There is little difference between negligence as treated by the New York Court of Appeals in *Hamilton* and intent when defined as becoming aware that conduct is interfering with a public right and nevertheless continuing to engage in that conduct.").

# 345

## ii. Negligent Conduct

■ Negligent conduct may give rise to a public nuisance. *See Copart Indus. v. Consol. Edison Co.,* 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968, 972 (N.Y.1977). Claims of public nuisance arising in part out of the negligent conduct of one or more defendants differ in some respects from a traditional cause of action for negligence. Where a nuisance is based on negligence, a plaintiff must still prove a duty of care and subsequent breach, but the duty at issue is to the public or to a substantial number of persons. *NAACP,* 271 F.Supp.2d at 490. Similarly, the circumstances under which a defendant may be found in breach of that duty differ as the number of persons affected, and therefore the foreseeability of the harm and unreasonableness of failing to act to prevent it, increases. *See id.* at 492 ("[W]here danger to the whole community is involved, the degree of seriousness with which reasonable entrepreneurs will seek to avoid the danger increases.").

The New York Court of Appeals has not addressed the question whether gun manufacturers or retailers owe a duty to the public to exercise care in the marketing and distribution of their firearms. It has, however, considered whether gun companies owe a duty of care to individual victims of violence in the context of a negligence action. *See Hamilton v. Beretta U.S.A. Corp.,* 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001). The *Hamilton* court's statements are instructive in considering whether a duty underlies the instant suit. It must be remembered that *Hamilton* was an action by private plaintiffs seeking damages for past delicts, whereas the instant case is one by a major city seeking only an injunction to prevent future harm to the City and those within it.

The New York Court of Appeals in *Hamilton* held that persons killed by illegally obtained handguns are not owed a duty by handgun manufacturers to exercise reasonable care in the marketing and distribution of their handguns. *Id.* It did not, however, bar all such negligence claims in the future, stating, "[t]ort law is ever changing; it is a reflection of the complexity and vitality of daily life ... Whether in a different case, a duty may arise remains a question for the future." *Id.*

The New York Court of Appeals predicated its decision on plaintiffs' inability to make a tangible showing that: (1) "defendants were a direct link in the causal chain that resulted in plaintiffs' injuries"; (2) "defendants were realistically in a position to prevent the wrongs"; or (3) there was any "statistically significant relationship between particular classes of dealers and crime guns." *See id.* at 236, 750 N.E.2d 1055 (emphasis omitted). Such a showing was necessary to ensure that there is no threat of a "specter of limitless liability." *Id.* In different circumstances, the court suggested that a duty may be imposed under a theory of negligent entrustment: "[This] doctrine might well support the extension of a duty to manufacturers to avoid selling to certain distributors in circumstances where the manufacturer knows or has reason to know those distributors are engaging in substantial sales of guns into the gun-trafficking market on a consistent basis." *Id.* Under the negligent entrustment doctrine, "[t]he possessor of a dangerous instrument is under a duty to entrust it to a responsible person whose use will not create an unreasonable risk of harm to others. The duty may extend through successive, reasonably anticipated entrustees." *Id.* (citing *Rios v. Smith,* 95 N.Y.2d 647, 722 N.Y.S.2d 220, 744 N.E.2d 1156 (N.Y.2001); *Splawnik v. DiCaprio,* 146 A.D.2d 333, 540 N.Y.S.2d 615 (N.Y.App. Div.3d Dep't 1989); RESTATEMENT (SECOND) OF TORTS § 390). While the New York Court of Appeals found that "no such evidence was presented in *Hamilton,* 'a showing that specific groups of dealers play a disproportionate role in supplying the illegal market,' could support a finding of a duty of care with respect to other members of the gun industry dealing with those particular retailers." *NAACP,* 271 F.Supp.2d at 491 (quoting *Hamilton,* 727 N.Y.S.2d 7, 750 N.E.2d at 1064).

In *Sturm, Ruger,* the Appellate Division considered the concept of duty in the context of a public nuisance action. 761 N.Y.S.2d at 200–01. Although it noted that "the [New York] Court of Appeals seems reluctant to extend duties currently recognized between certain parties 'beyond that limited class of plaintiffs to members of the community at large,' " the court conceded that such a duty

to the public may exist. *Id.* at 201 (quoting *Hamilton,* 727 N.Y.S.2d 7, 750 N.E.2d at 1061). Because it found that "the duty which [the State's] complaint ultimately seeks to impose is similar to the one the *Hamilton* court unanimously rejected," it dismissed the suit on similar grounds. *Id.* at 201.

*iii. Otherwise Lawful Conduct*

■ The fact that a defendant's conduct is otherwise lawful does not preclude liability for public nuisance. *See State v. Waterloo Stock Car Raceway, Inc.,* 96 Misc.2d 350, 409 N.Y.S.2d 40, 44–45 (N.Y.Sup.Ct.1978); 81 N.Y. Jur.2d, NUISANCES § 61; *see also Sturm, Ruger,* Index No. 402586/00, at 22, 2001 WL 35994963 ("[T]he lawful nature of a defendant's business and the non-defective condition of its product are significant but not necessarily determinative."). It is settled that an otherwise lawful business, even one operating in conformity with relevant statutory requirements, may be enjoined when it creates or contributes to a public nuisance because of the manner or circumstances in which it operates. *See e.g., N.Y. Trap Rock Corp. v. Town of Clarkstown,* 299 N.Y. 77, 85 N.E.2d 873 (N.Y.1949) (quarry operations); *Clawson v. Central Hudson Gas & Elec. Corp.,* 298 N.Y. 291, 83 N.E.2d 121 (N.Y. 1948) (dam); *Hoover v. Durkee,* 212 A.D.2d 839, 622 N.Y.S.2d 348 (N.Y.App. Div.3d Dep't 1995) (auto racetrack); *Shaw's Jewelry Shop, Inc. v. N.Y. Herald Co.,* 170 A.D. 504, 156 N.Y.S. 651 (N.Y.App. Div. 1st Dep't 1915) ("automatic baseball playograph"); *City of Rochester v. Premises Located at 10–12 S. Wash. St.,* 180 Misc.2d 17, 687 N.Y.S.2d 523 (N.Y.Sup.Ct.1998) (nightclub); *Town of Preble v. Song Mountain,* 62 Misc.2d 353, 308 N.Y.S.2d 1001 (N.Y.Sup.Ct.1970) (open air concert). The only exception is where the specific conduct at issue is "fully authorized by statute, ordinance or administrative regulation." RESTATEMENT (SECOND) OF TORTS § 821 B, cmt. f; *see also Hill v. City of New York,* 139 N.Y. 495, 34 N.E. 1090, 1092 (N.Y. 1893) ("[T]he authority which will thus shelter an actual nuisance must be express ... For, consider what the proposition is. It upholds a positive damage to the citizen and denies him any remedy ... Surely, an authority which so results should be remarkably strong and clear.").

That the firearms industry is, in some respects, regulated at the federal, state and local level does not preclude the instant suit. Both federal and New York state firearms laws and regulations have expressly disavowed any preemptive effect on state common law. *See, e.g.,* 18 U.S.C. § 927 ("No provision of this chapter [Chapter 44–Firearms] shall be construed as indicating an intent on the part of Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together."); N.Y. Penal Law § 5.10(3) (penal laws pertaining to licensing of firearms and criminal negligence do "not bar, suspend, or otherwise affect any right or liability to damages, penalty, forfeiture or other remedy authorized by law to be recovered or enforced in a civil action").

The existence of a regulatory statutory scheme governing some aspects of the firearms industry does not mean that the conduct alleged is fully authorized. *See Ileto v. Glock,* 349 F.3d 1191, 1214–15 (9th Cir.2003) ("[A]lthough gun manufacturing is legal and the sale of guns is regulated by state and federal law, the distribution and marketing of guns in a way that creates and contributes to a danger to the public generally ... is not permitted under law."); *City of Gary v. Smith & Wesson, Corp.,* 801 N.E.2d 1222, 1235 (Ind.2003) ("[G]un regulatory laws leave room for the defendants to be in compliance with those regulations while still acting unreasonably and creating a public nuisance."). When a substantial interference with a public right is alleged, a court cannot, as a matter of law, deny judicial recourse to those who try to enjoin it simply because it involves otherwise lawful commercial activity.

*b. Causation*

*i. Factual Cause*

■ Satisfaction of the causation requirement for liability in public nuisance actions requires proof that a defendant, alone or with others, created, contributed to, or maintained the alleged interference with the public right.

*See, e.g., Hine v. Aird–Don Co.*, 232 A.D. 359, 250 N.Y.S. 75, 77 (N.Y.App. Div.3d Dep't 1931); *McNulty v. Ludwig & Co.*, 153 A.D. 206, 138 N.Y.S. 84, 91 (N.Y.App. Div. 2d Dep't 1912); *Sullivan v. McManus*, 19 A.D. 167, 45 N.Y.S. 1079, 1080 (N.Y.App. Div. 1st Dep't 1897). Whether specific acts or omissions meet this standard involves a fact-intensive inquiry, making it difficult to resolve the issue on a motion to dismiss on the pleadings. *See, e.g., Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 434 N.Y.S.2d 166, 414 N.E.2d 666, 670 (N.Y.1980) (noting in context of negligence action that issues of causation are generally for the fact finder to resolve).

■■■■■ Persons who join or participate in the creation or maintenance of a public nuisance are liable jointly and severally for the wrong and resulting injury. *See State v. Schenectady Chems. Inc.*, 103 A.D.2d 33, 479 N.Y.S.2d 1010, 1014 (N.Y.App. Div.3d Dep't 1984) (citing *Simmons v. Everson*, 124 N.Y. 319, 26 N.E. 911 (N.Y.1891)). Where it is difficult or impossible to separate the injury caused by one contributing actor from that caused by another and where each contributing actor's responsibility individually does not constitute a substantial interference with a public right, defendants may still be found liable for conduct creating in the aggregate a public nuisance if the suit is one for injunctive relief. *NAACP*, 271 F.Supp.2d at 493 (citing *Chipman v. Palmer*, 77 N.Y. 51, 1879 WL 12206 (N.Y.1879)). Liability under such circumstances may be dependent on the actor's awareness of the other contributors' activities or the effect of their actions in the aggregate. RESTATEMENT (SECOND) OF TORTS § 840E, cmt. b.

■■■■■ The tortious actions or omissions of a defendant or defendants need not be the immediate cause of injury to the public. If a defendant's conduct "remains the dominant and relevant fact without which the public nuisance would not have resulted where and under the circumstances it did," *United States v. Hooker Chems. & Plastics Corp.*, 722 F.Supp. 960, 968 (W.D.N.Y.1989) (citation omitted), it may be held liable for setting in motion or being a force in the sequence of events resulting in injury to the public. Intervening actions, even multiple or criminal actions taken by third parties, do not break

the chain of causation if a defendant could reasonably have expected their nature and effect. *See, e.g., State v. Schenectady Chems. Inc.*, 103 A.D.2d 33, 479 N.Y.S.2d 1010, 1014 (N.Y.App. Div.3d Dep't 1984) (chemical manufacturer may be liable for public nuisance even where it contracted with third party for disposal of chemical byproduct wastes); *Caso v. District Council 37*, 43 A.D.2d 159, 350 N.Y.S.2d 173, 175, 178 (N.Y.App. Div.2d Dep't 1973) (a common law public nuisance action is an "appropriate remedy" where illegal strike by public employees who serviced sewage treatment plants led to release of raw sewage into river; eventually it washed up onto beaches contaminating the water supply); *City of Rochester v. Premises Located at 10–12 S. Wash. St.*, 180 Misc.2d 17, 687 N.Y.S.2d 523, 527 (N.Y.Sup.Ct.1998) (nightclub owner could be held liable for off-premises conduct of his patrons upon leaving the club); *State v. Fermenta ASC Corp.*, 160 Misc.2d 187, 608 N.Y.S.2d 980, 985 (N.Y.Sup. Ct.1994) (lack of control over an herbicide at time injury to public occurred does not preclude public nuisance action against manufacturer).

### ii. Proximate Cause

Separate and apart from factual cause is the concept of proximate cause. Proximate cause embodies a policy requirement in some tort actions that a defendant's tortious conduct be so causally sufficiently close to the harm suffered that it is just or fair to hold the defendant liable for the consequences of its actions. *See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235 (2d Cir.1999) ("Because the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history, proximate cause is used essentially as a legal tool for limiting a wrongdoer's liability only to those harms that have a reasonable connection to his actions."). The label "proximate cause" has occasionally been employed in public nuisance actions. *See NAACP*, 271 F.Supp.2d at 496 (citing public nuisance cases but noting that they often involve more than one cause of action or are otherwise ambiguous). In such cases, "where the welfare and safety of an entire community is at stake, the cause

need not be so proximate as in individual negligence cases." *Id.* at 497.

### iii. Causation in Suits Against the Firearms Industry

The possibility that, under some set of circumstances, a causal connection between harm suffered by the public and the conduct of members of the gun industry might be shown has not been precluded by the New York courts. In *Sturm, Ruger* the trial court, while finding that the harm alleged was too remote from defendants' conduct, explicitly left open the possibility that such a showing might be possible with advances in research and available data. Index No. 402586/00, at 26–27, 2001 WL 35994963 ("In order to assert the broad liability suggested by the Complaint, plaintiffs must allege more facts which would demonstrate that defendants are somehow contributing to the handgun nuisance. This may become possible as further BATF investigations provide more information about the manufacture, sale and eventual unlawful use of handguns."). The Appellate Division affirmed, finding it "inappropriate at this juncture to sustain this complaint." 761 N.Y.S.2d at 200 (emphasis added).

Both the trial court and the Appellate Division in *Sturm, Ruger* relied in large measure on the decision of the New York Court of Appeals in *Hamilton,* 727 N.Y.S.2d 7, 750 N.E.2d at 1055. In considering a negligence claim brought by individual gunshot victims against members of the firearms industry, the *Hamilton* court found that the causal connection between the harm suffered and the conduct of the defendants was too attenuated. *Id.* at 1062. It left open the possibility that liability could be imposed upon "a tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs' injuries, and that defendants were realistically in a position to prevent the wrongs." *Id.*

### 2. Application of Law to Facts

▪ The amended complaint contains sufficient allegations to sustain a public nuisance claim. First, it pleads the required elements of a public nuisance claim, including allegations of a number of different types of unreasonable conduct and omissions by defendants:

> Defendants, through their unlawful sales practices, acts and omissions and violation of N.Y. Penal Law § 400.05(1), have knowingly and/or recklessly created, contributed to and helped to maintain an existing and continuing public nuisance of longstanding that unreasonably and substantially: interferes with rights common to the general public; deprives City residents and visitors of the peaceful use of public streets, sidewalks, parks, and other public places; interferes with commerce, travel and the quality of daily life; and endangers the health, welfare, peace, safety, well-being, convenience and property of considerable numbers of residents of, and visitors to, New York City. This public nuisance constitutes an injury in fact to the City that is concrete and particularized, actual and imminent, and that is caused and/or contributed to by Defendants' acts and omissions.

Amended Compl. at ¶ 277. Even without reliance on Penal Law § 400.05, the City has properly alleged a claim of public nuisance.

Second, it is entirely proper to base an allegation of "unreasonable interference" on New York Penal Law § 400.05, which is a "legislative declaration that the conduct proscribed is an unreasonable interference with a public right." RESTATEMENT (SECOND) OF TORTS § 821 B, cmt. c. (quoted in *Beretta I,* 315 F.Supp.2d at 284). In such cases, "there may be no need for a court finding of unreasonableness," because the legislature has already made that determination. *Id.* New York Penal Law provides in relevant part: "Any weapon specified ... when unlawfully possessed, manufactured, transported or disposed of, or when utilized in the commission of an offense, is hereby declared a nuisance." N.Y. Penal Law § 400.05(1). The state trial court's dismissal of a similar statutory nuisance claim in *Sturm, Ruger,* Index No. 402586/00, at 29, 2001 WL 35994963, which was not challenged on appeal, provides no basis for dismissing the City's claim in the instant suit. Dismissal in *Sturm, Ruger* was based on the complaint's failure to "adequately allege that defendants are liable for

creating or maintaining a common law public nuisance." *Id.* In the instant case that defect does not exist.

The amended complaint pleads sufficient allegations of a public nuisance claim to withstand defendants' motion to dismiss.

### D. Statutory Nuisance

Defendants argue that the City has failed to state a claim for statutory nuisance based on a violation of Penal Law § 240.45 because that statute is only applicable to conduct that takes place in New York. To the extent defendants argue that New York state tort law cannot be applied to the conduct of out-of-state actors that has effects on citizens of New York, the argument has already been rejected. *See Beretta I,* 315 F.Supp.2d at 285 (quoting *Young v. Masci,* 289 U.S. 253, 258–59, 53 S.Ct. 599, 77 L.Ed. 1158 (1933)), in which the court held that "[t]he cases are many in which a person acting outside the State may be held responsible according to the law of the State for injurious consequences within it."

Where, as here, the court has found personal jurisdiction to exist over defendants under New York's long arm statute, it has already impliedly determined that the defendants' conduct may be challenged in New York, under New York law, including New York law of common law nuisance and its statutory codification. Defendants rely on *People v. Int'l Nickel Co.* to argue that a statutory nuisance cannot be proven in New York where the conduct took place out-of-state. 168 A.D. 245, 247, 153 N.Y.S. 295 (N.Y.App. Div.2d Dep't 1915). That case involved a criminal prosecution for nuisance, in which the court rejected the imposition of criminal liability in New York based on conduct occurring outside of New York: "criminal redress against defendant will have to be sought [in the foreign state]." *Id.* The City does not seek here to impose criminal liability on defendants, but rather to abate a public nuisance. Thus, the fact that some of the conduct alleged took place outside the state is irrelevant.

■ Moreover, "New York PL 240.45 is essentially a criminal codification of the common law doctrine of public nuisance." *Beretta II,* 401 F.Supp.2d at 271 (ruling on defendants' motion to dismiss). To state a claim for statutory nuisance the City need only allege that defendants engaged in the conduct declared unreasonable by New York Penal Law § 240.45—regardless of where that conduct took place—and that such conduct caused or contributed to a public nuisance in New York. The amended complaint does that. Additionally, as was held in denying Rule 12(b)(6) motions in *Beretta,* where "the City has adequately pled a cause of action for common law public nuisance, its overlapping statutory claim need not be dismissed." *Id.* at 285.

### E. Protection of Lawful Commerce in Arms Act

#### 1. Law

On October 26, 2005, the President of the United States approved the Protection of Lawful Commerce in Arms Act, Pub.L. No. 109–92, 119 Stat. 2095 ("PLCAA"). The Act, which was immediately effective, requires that a "qualified civil liability action that is pending on the date of enactment . . . shall be immediately dismissed." PLCAA § 3(b). The stated purpose is to promptly terminate existing and prevent future "qualified civil liability actions," as defined by the Act. The *Gun Store and Gallery Distributing* argue that the PLCAA requires immediate dismissal. They point out that the Act prohibits the institution of a qualified civil liability action in any state or federal court and provides that any such "action that is pending on the date of enactment of this Act shall be immediately dismissed by the court in which the action was brought or is currently pending." PLCAA § 3(a) & (b).

In *Beretta,* a suit by the City of New York against the main gun suppliers (as compared to retailers, as in the instant case), the City argued that (1) the PLCAA is inapplicable because the case falls within an exception to a "qualified civil liability action," and (2), if the PLCAA is applicable to the present litigation, it is unconstitutional. *See Beretta II,* 401 F.Supp.2d at 251. The PLCAA was found to be inapplicable in that case because the city's action fell under the exception; the act was declared to be constitutional as there applied. *Id.* 401 F.Supp.2d 244. The court

stayed proceedings in that case to allow for an interlocutory appeal to the Court of Appeals for the Second Circuit on the issue.

With exceptions not here relevant, "a qualified civil liability action" permitted under the PLCAA is a "civil action . . . brought by any person against a manufacturer or seller of a [firearm that has been shipped or transported in interstate or foreign commerce] . . . for damages, . . . injunctive or declaratory relief, abatement, . . . or other relief, resulting from the criminal or unlawful misuse of [the firearm]." *Id.* §§ 4(4) and 4(5). A "person" is defined by the Act as "any . . . corporation, . . . or any other entity, including any governmental entity." *Id* § 4(3). The issue is whether the Act is inapplicable because the instant suit falls under section 4(5)(A)(iii) of the Act. That section preserves from dismissal actions in which a firearms manufacturer or seller knowingly violated a state or federal statute "applicable to" the sale or marketing of firearms and the violation was a proximate cause of the harm for which relief is sought. Since section 4(5)(A)(iii) applies to the present action, the PLCAA does not require dismissal.

The Act is primarily a set of definitions supporting two directory provisions, one of which bars commencing a defined type of civil action—a "qualified civil liability action"—in state or federal court, and another that directs state and federal courts to dismiss pending civil actions that meet the definition. *See* PLCCA § 3(a) and (b). The directory provisions of the Act's 3(a) and (b) state:

(a) IN GENERAL. A qualified civil liability action may not be brought in any Federal or State court.

(b) DISMISSAL OF PENDING ACTIONS. A qualified civil liability action that is pending on the date of the enactment of this Act shall be immediately dismissed by the court in which the action was brought or is currently pending.

The definition of a "qualified civil liability action" that is a necessary condition for sections 3(a) and (b) to apply is found in Section 4(5):

(5) QUALIFIED CIVIL LIABILITY ACTION.

(A) IN GENERAL. The term "qualified civil liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party . . . .

Sections 4(5)(A)(i), (ii) and (iii) provide that qualified civil liability actions "*shall not include*" actions in which specified conduct is placed at issue. (Emphasis added.) Actions that meet the definitions of Section 4(5)(A)(i)(ii) or (iii) are excluded from the scope of the directory provisions. Such actions are, as indicated below, not "qualified civil liability actions" even if they might otherwise meet the definition of Section 4(5)(A). The provision reads:

(5) QUALIFIED CIVIL LIABILITY ACTION.

(A) . . . The term "qualified civil liability action . . ." shall not include—

(i) an action brought against a transferor convicted under section 924(h) of title 19, United States Code, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;

(ii) an action brought against a seller for negligent entrustment or negligence per se;

(iii) an action in which a manufacturer or seller of a qualified product *knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought,* . . .

(Emphasis added).

The general exception in section 4(5)(A)(iii) for lawsuits based on a knowing violation of a state or federal statute "applicable to" the sale or marketing of firearms is followed by two specific examples of statutory violations that trigger that exception. PLCAA §§ 4(5)(A)(iii)(I) and (II) read:

(iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including—

(I) any case in which a manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or (II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18, United States Code.

For ease of reference, section 4(5)(A)(iii) is referred to as the "predicate exception," because its operation requires an underlying or predicate statutory violation. The "State or Federal statute applicable to the sale or marketing of the product," whose violation serves as the basis for invoking the predicate exception is referred to as a "predicate statute."

In *Beretta II,* the court held that predicate exception is available where violations of any statute capable of being applied to the sale and marketing of firearms are alleged. *See Beretta II,* 401 F.Supp.2d 244. The PLCAA was held inapplicable to a public nuisance action by the City alleging that firearms manufacturers and distributors were engaging in unreasonable conduct that contributed to the unreasonable interference with a public right, in violation of New York Penal Law 240.45, and that such conduct was a proximate cause of injury to the City. *Id.* at 244. Section 240.45 provides in relevant part:

A person is guilty of criminal nuisance in the second degree when:

1. By conduct either unlawful in itself or unreasonable under all the circumstances, he knowingly or recklessly creates or maintains a condition which endangers the safety or health of a considerable number of persons; or....

Criminal nuisance in the second degree is a class B misdemeanor.

N.Y.P.L. § 240.45.

### 2. *Application of Law to Facts*

■ The Gun Store and Gallery Distributing argue that the amended complaint is subject to dismissal under the PLCAA because it is a "qualified civil action," and does not fall within predicate exception for actions "in which a manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or marketing of [a firearm]...." 15 U.S.C. § 7903(5)(A)(iii). Specifically, these defendants argue that the predicate exception only applies to "firearms related law"—that is, statutes applicable only to the sale and marketing of firearms. *See* The Gun Store's and Gallery Distributing's Motion to Dismiss at 8–9.

The PLCAA is inapplicable to this action because the amended complaint alleges violations of state and federal firearms-related statutes. Specifically, the City has alleged that defendants' participation in straw purchases violates sections 922, 923 and 924 of Title 18 of the United States Code, all of which specifically relate to the sale and marketing of firearms. *See* 18 U.S.C. §§ 922, 923, 924; *see also* Amended Compl. at ¶¶ 73, 85, 96, 107, 119, 133, 149, 167, 181, 190, 203, 216, 238, 249, 262, 249, 262. Section 922 prohibits certain conduct relating to the sale, transfer, transport, manufacture, and importation of firearms and ammunition; section 923 governs the licensing of manufacturers, importers and dealers of firearms and ammunition; and section 924 imposes criminal penalties for certain conduct relating to the sale, transfer, transport, manufacture and importation of firearms and ammunition. The City has also alleged violations of New York Penal Law § 400.05, a state statute (set out below) that specifically addresses the nuisance caused by firearms. *See Smith & Wesson Corp. v. City of Gary,* 875 N.E.2d 422 (Ind.

Ct.App.2007) (holding that the PLCAA does not bar City of Gary, Indiana's claims for public nuisance because the City alleged violations of Indiana state nuisance statute applicable to the sale and marketing of firearms).

The Gun Store and Gallery Distributing also claim that the City has failed to clarify, explain or specify its reference to federal law. *See* The Gun Store's and Gallery Distributing's Motion to Dismiss at 6. The amended complaint does assert that defendants "sell[ ] handguns in a manner that either intentionally violates federal law or is contrary to stated industry practice." Amended Compl. at ¶ 22. The amended complaint alleges that "[s]pecifically, upon information and belief, defendants sell handguns to prohibited persons through 'strawman' purchases, in which an individual legally able to buy a handgun purchases the gun from a licensed gun dealer, intending to transfer it immediately to a prohibited person." *Id.* Thus the City has alleged violations of federal statutes expressly and specifically applicable to the sale and marketing of firearms.

The Gun Store and Gallery Distributing also argue that New York Penal Law § 400.05(1) is not a predicate statute under the PLCAA because although it specifically relates to firearms, it "is not applicable to the sales or marketing of a firearm." The Gun Store's and Gallery Distributing's Motion to Dismiss at 8.

The amended complaint supports the City's argument that § 400.05(1) is a predicate statute. It is alleged:

Defendants, through their unlawful sales practices, acts and omissions and violation of N.Y. Penal Law § 400.05(1), have knowingly and/or recklessly created, contributed to and helped to maintain an existing and continuing public nuisance of longstanding that unreasonably and substantially: interferes with rights common to the general public; deprives City residents and visitors of the peaceful use of public streets, sidewalks, parks, and other public places; interferes with commerce, travel and the quality of daily life; and endangers the health, welfare, peace, safety, well-being, convenience and property of considerable numbers of residents of, and

visitors to, New York City. This public nuisance constitutes an injury in fact to the City that is concrete and particularized, actual and imminent, and that is caused and/or contributed to by defendants' acts and omissions.

Amended Compl. ¶ 277.

New York Penal Law § 400.05(1) deals with the situation described in the City's claims. It provides, as follows:

Any weapon, instrument, appliance or substance specified in article two hundred sixty-five, when unlawfully possessed, manufactured, transported or disposed of, or when utilized in the commission of an offense, is hereby declared a nuisance. When the same shall come into the possession of any police officer or peace officer, it shall be surrendered immediately to the official mentioned in paragraph (f) of subdivision one of section 265.20, except that such weapon, instrument, appliance or substance coming into the possession of the state police shall be surrendered to the superintendent of state police.

A fair reading of Penal Law § 400.05(1) leads to the conclusion that this statute expressly declares that any unlawfully possessed, transported or disposed of handgun is a nuisance. It follows that the unlawful possession, transport or disposal of a gun refers to, and is related to, the manner in which a firearm is or was sold, purchased, or marketed.

In this action, the City, as it did in *Beretta*, alleges violations of New York Penal Law 240.45:

Defendants' conduct violates New York Penal Law § 240.45, Criminal Nuisance in the Second Degree, because Defendants' conduct is either unlawful in itself or unreasonable under all the circumstances, and Defendants have knowingly or recklessly created or maintained a condition that endangers the safety or health of a considerable number of persons.

Defendants, through their violation of N.Y. Penal Law § 240.45, have knowingly and/or recklessly created, contributed to and helped to maintain an existing and continuing public nuisance of long-standing that unreasonably and substantially: inter-

feres with rights common to the general public; deprives City residents and visitors of the peaceful use of public streets, sidewalks, parks, and other public places; interferes with commerce, travel and the quality of daily life; and endangers the health, welfare, peace, safety, well-being, convenience and property of considerable numbers of residents of, and visitors to, New York City. This public nuisance constitutes an injury in fact to the City that is concrete and particularized, actual and imminent, and that is caused and/or contributed to by Defendants' acts and omissions. Amended Compl. ¶¶ 282–83. As was held in *Beretta II*, section "240.45 satisfies the language of the predicate exception requiring a 'statute applicable to the sale or marketing of [firearms].'" *Beretta II* 401 F.Supp.2d at 261.

Because the instant action alleges violations of several federal and state statutes by the defendants, it falls within the predicate exception of the PLCAA. The PLCAA does not bar this action.

### F. Vagueness and Remedy

The Gun Store and Gallery Distributing argue that the amended complaint is vague in defining a straw purchase, and therefore subject to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Such contentions do not merit dismissal of an action. If necessary, defendants can move for a more definite statement under Rule 12(e). *See* Fed.R.Civ.P. 12(e) ("A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response . . . ."); *see also United States v. Employing Plasterers Ass'n*, 347 U.S. 186, 189, 74 S.Ct. 452, 98 L.Ed. 618 (1954) ("where a bona fide complaint is filed that charges every element necessary to recover, summary dismissal of a civil case for failure to set out evidential facts can seldom be justified;" "[i]f a party needs more facts, it has a right to call for them under Rule 12(e) of the Federal Rules of Civil Procedure"); *Twombly*, 127 S.Ct. at 1974 (a plaintiff need plead only "enough facts to state a claim to relief that is plausible on its face.").

The amended complaint meets applicable pleading requirements by giving defendants fair notice of the City's claim that, by defendants' conduct, including their willingness to permit and facilitate straw purchases in violation of federal law, they have created and contributed to a public nuisance in the City of New York. The amended complaint devotes at least eight paragraphs to defining, explaining and illustrating straw purchases, *see* Amended Compl. ¶¶ 22–23; 58–63, with at least twenty paragraphs discussing the willingness of the Gun Store and Gallery Distributing to engage in straw sales, *see id.* at 141–50, 157–68.

■ As to the Gun Store's and Gallery Distributing's contention that the remedy sought by the City is impermissibly vague or unconstitutional, a motion for failure to state a claim properly addresses the cause of action alleged, not the remedy sought. It is the court that will craft any remedy. Only when that remedy has been determined may defendants contest its application on grounds of vagueness or some other violation of Rule 65(d) of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 65(d)(1) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail, and not by referring to the complaint or other document, the act or acts restrained or required."); *United States by Clark v. Georgia Power Co.*, 301 F.Supp. 538 (N.D.Ga.1969) (dismissing a motion to dismiss for lack of specificity as to the alleged act to be enjoined or restrained, and holding that Rule 65(d), which governs the form of an injunction or restraining order, "is silent as to the specificity required in the complaint's request for injunction"; Rule 8 simply "requires the complaint to contain a demand for judgment for the relief to which the plaintiff deems himself entitled"); *Howard Opera House Assocs. v. Urban Outfitters, Inc.*, 322 F.3d 125, 130 (2d Cir.2003) (where the district court erred in issuing an injunction that was vague, case remanded so the court could craft the injunction more precisely); *Beretta I*, 315 F.Supp.2d at 286 ("Objections that particular provisions of the injunctive relief requested place an impermissible burden on interstate

commerce can be considered on a case-by-case basis in a subsequent phase of this litigation if it becomes necessary to do so").

## G. Extra–Territoriality, Comity and Due Process

Old Dominion asserts that the injunctive relief sought by the City would violate the Due Process Clause by attempting to regulate conduct outside its borders. According to the principle established in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 573, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Due Process Clause prevents a state from punishing conduct that was lawful where it occurred if it had no impact on the state or its residents.

■■■ Principles of state sovereignty and comity do not bar any of the claims or relief sought in the instant suit. The City seeks relief for the harm imposed on itself and on those within its own borders. *See Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 941 (4th Cir.1994) ("While the jurisprudence of personal jurisdiction has focused on fixing the minimum measurement of a person's contact with a state necessary *to* substitute for the person's presence in the state and thus to justify that state's imposing an in personam judgment over the person, the immediate concept of 'presence' is no longer part of the language. Nevertheless, the establishment of a surrogate for presence has been the core task in defining the due process boundaries of a state's legitimate exercise of sovereignty over a person beyond its borders."); *Twine v. Levy*, 746 F.Supp. 1202 (E.D.N.Y.1990) ("The business conducted by the non-domiciliary must be sufficiently consistent and persistent to support the legal fiction that the non-domiciliary defendant is present within the state"); *New Jersey v. City of New York*, 283 U.S. 473, 483, 51 S.Ct. 519, 75 L.Ed. 1176 (1931) ("Defendant contends that, as it dumps the garbage into the ocean and not within the waters of the United States or of New Jersey, this Court is without jurisdiction to grant the injunction. But the defendant is before the Court and the property of plaintiff and its citizens that is alleged to have been injured by such dumping is within the Court's territorial jurisdiction. The situs of the acts creating the nuisance, whether within or without the United States, is of no importance. Plaintiff seeks a decree *in personam* to prevent them in the future. The Court has jurisdiction.").

As the Federal District Court for the Eastern District of Virginia has noted, placing a dangerous instrumentality in commerce is an important consideration in determining jurisdiction over the persons responsible.

> When the nonresident defendant places an inherently dangerous substance, .... into the stream of commerce, there is a substantial likelihood that the defendant will be called upon to defend in the state whose citizens have been injured or endangered by that instrumentality. Thus, the nature of the product may well have a bearing upon the issue of minimum contact, with a lesser volume of inherently dangerous products constituting a more significant contact with the state than would a larger volume of products offering little or no hazard to the inhabitants of the state.... When an inherently dangerous instrumentality is released in commerce, and that instrument causes tortious injury in a foreign forum, the threshold for establishing jurisdiction is less demanding.

*Allied Towing Corp. v. Great E. Petro. Corp.*, 642 F.Supp. 1339, 1355–56 (E.D.Va.1986) (quotation marks and citations omitted). *See also Velandra v. Regie Nationale des Usines Renault*, 336 F.2d 292 (6th Cir.1964) (a lesser volume of an inherently dangerous product constitutes a more significant contact with the state than would a larger volume of a non-hazardous product); *Lichina v. Futura, Inc.*, 260 F.Supp. 252, 256 (D.Colo.1966) (where safety of the public is at stake, "the sale of a dangerous product is regarded as a more substantial contact than the sale of a harmless one."); *Poyner v. Erma Werke GmbH*, 618 F.2d 1186, 1192 (6th Cir.1980), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980) (handgun manufacturer; "[i]njuries caused by inherently dangerous articles imported through independent distributors certainly fall within that class of litigation with which the forum state has a deep interest in adjudicating."); *O'Neil v. Picillo*, 682 F.Supp. 706 (D.R.I.1988) (where a defendant deals in such inherently danger-

ous products, a lesser showing than is ordinarily required will support jurisdiction.); *Value Eng'g Co. v. Gisell*, 140 Ga.App. 44, 230 S.E.2d 29 (1976) (same).

Old Dominion and the Adventure Outdoors group argue that the City is seeking extraterritorial application of its criminal laws. The City's reliance on two New York State statutes, New York Penal Law §§ 240.25 and 400.05 serves as evidence of a nuisance *per se. See, e.g., Janik v. City of Dallas*, No. 95–CV–2594, 1998 WL 249213, 1998 U.S. Dist. Lexis 7075 (N.D.Tex. May 12, 1998) (plaintiffs properly utilized statutory violations to aid in proving nuisance-related causes of action, "so that the Clean Water Act and/or RCRA statutory violations 'convert' the plaintiffs' common law nuisance claims into ... nuisance per se claims."); *Branch v. W. Petro., Inc.*, 657 P.2d 267 (Utah 1982) ("When the conditions giving rise to a nuisance are also a violation of statutory prohibition, those conditions constitute a nuisance per se, and the issue of the reasonableness of the defendant's conduct and the weighing of the relative interests of the plaintiff and defendant is precluded because the Legislature has, in effect, already struck the balance in favor of the innocent party.").

### H. Conclusion as to Motions to Dismiss for Failure to State a Claim

The defendants' motion to dismiss the City's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is denied.

### VII. MOTION TO STAY PROCEEDINGS

Defendants request a stay of proceedings pending the decision of the Court of Appeals for the Second Circuit in *Beretta* on the issue of whether New York Penal Law § 240.45 is applicable to the sale and marketing of firearms. *See Beretta II*, 401 F.Supp.2d at 298 (staying all proceedings in *Beretta* to allow for an interlocutory appeal to the Court of Appeals for the Second Circuit). These defendants assert that the *Beretta* decision may interpret the PLCAA in such a way as to bar the City's amended complaint. A decision by the Court of Appeals in *Beretta* is unlikely to affect the present action which rests on violations of both federal and state firearms-relat-

ed statutes. *See* 15 U.S.C. § 7903(5)(a)(iii). A stay would delay the case for no persuasive reason. As Justice Cardozo has explained,

> [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. True, the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else. Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both.

*Landis v. N. Am. Co.*, 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936). To impose a stay in the instant case pending appellate review of a non-dispositive issue by the Court of Appeals for the Second Circuit in *Beretta* would run counter to tenets of judicial efficiency

Defendants' motion for a stay of these proceedings is denied.

### VIII. MOTION FOR CERTIFICATION FOR INTERLOCUTORY APPEAL BY OLD DOMINION

Old Dominion's requests a certification for interlocutory appeal pursuant to section 1292(b) of title 28 of the United States Code. That section provides:

> § 1292. Interlocutory decisions .... (b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

The Supreme Court has explained that only "exceptional circumstances" can "justify a de-

parture from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (quotation marks omitted); *see also Koehler v. Bank of Bermuda, Ltd.,* 101 F.3d 863, 865 (2d Cir.1996) (certification improvidently granted; case remanded for discovery on personal jurisdiction); *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.,* 71 F.Supp.2d 139, 161 (E.D.N.Y.1999) (noting that the Court of Appeals for the Second Circuit has "repeatedly advised [that] section 1292(b) was designed to be a rarely used exception to the final judgment rule").

No exceptional circumstances warrant an interlocutory appeal in the instant case. *See City of New York v. A–1 Jewelry & Pawn, Inc.,* 501 F.Supp.2d 369 (E.D.N.Y.2007), *reconsideration denied by* Order dated Sept. 27, 2007. The issues raised by the defendants in their motions to dismiss do not present controlling questions of law as to which there is substantial ground for difference of opinion. Certification would not materially advance the ultimate determination of the case since the trial should be completed substantially before an appeal would be decided. *See Koehler,* 101 F.3d at 865 ("It is a basic tenet of federal law to delay appellate review until a final judgment has been entered."); *Nat'l Asbestos Workers Med. Fund,* 71 F.Supp.2d at 166 (E.D.N.Y.1999) ("District courts [ ] have independent and unreviewable authority to deny certification even where the three statutory criteria are met.").

A certificate for an interlocutory appeal is denied.

## IX. CONCLUSION

The City's motion to amend the complaint against the Gun Store and Gallery Distributing is granted. Defendants' motion to dismiss for lack of subject matter jurisdiction, to dismiss for lack of personal jurisdiction, and to dismiss for failure to state a claim upon which relief can be granted are denied. The motion to stay these proceedings is denied. Old Dominion's motion to certify any unfavorable decision for interlocutory appeal

is denied. Trial is set for April 28, 2007, at 10:00 a.m.

SO ORDERED.